# IN THE SUPREME COURT OF IOWA

No. 14–0830

Filed June 30, 2017

Amended September 26, 2017

**STATE OF IOWA,**

Appellee,

vs.

**DALE DEAN PETTIJOHN JR.,**

Appellant.

Appeal from the Iowa District Court for Polk County, Terry Wilson, Odell McGhee, and William Price, Judges.

A defendant challenges his conviction for operating while intoxicated under Iowa Code section 462A.14(1) (2013). **DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Grant C. Gangestad of Gourley, Rehkemper & Lindholm, P.L.C., West Des Moines, for appellant.

Thomas J. Miller, Attorney General, Heather R. Quick (until withdrawal), Kevin Cmelik and Louis S. Sloven, Assistant Attorneys General, John P. Sarcone, County Attorney, and Jordan Roling, Assistant County Attorney, for appellee.

**WIGGINS, Justice.**

The defendant moved to suppress all evidence obtained after an officer seized the boat he was operating, including the results of a breath test he submitted to after an officer invoked the implied-consent procedure set forth in Iowa Code chapter 462A (2013). The district court denied the motion to suppress, concluding the seizure was justified by the community-caretaking exception to the warrant requirement and the administration of the warrantless breath test violated neither the Fourth Amendment to the United States Constitution nor article I, section 8 of the Iowa Constitution. The court convicted the defendant following a bench trial on the minutes, and the defendant appealed. We retained the appeal but held the matter in abeyance pending a decision from the United States Supreme Court.

We conclude the seizure of the boat the defendant was operating violated neither the Fourth Amendment nor article I, section 8 because the officer who stopped the defendant had a reasonable, articulable suspicion he was committing a crime. However, because we also conclude the administration of the warrantless breath test violated article I, section 8, we reverse the judgment of the district court and remand the case for a new trial.

### I. Background Facts.

On August 18, 2013, at approximately 5:00 p.m., Iowa Department of Natural Resources (DNR) Water Patrol Officer William Wineland observed Dale Dean Pettijohn Jr. operating a rented pontoon boat in the no-wake zone of Saylorville Lake in Polk County, a manmade reservoir created by the U.S. Army Corps of Engineers and fed by the Des Moines River. At the time, Pettijohn was operating the boat at an appropriate speed and was not swerving or steering erratically. However, Officer

Wineland noticed a female passenger sitting on a sundeck located at the rear of the boat with her feet dangling over its back edge near the motor.

Because he had worked as a water patrol officer for many years, Officer Wineland was familiar with the location of the propellers on the rental boats at Saylorville Lake. He knew there was no guard or housing around the propeller on the rented pontoon boat Pettijohn was operating. Having previously witnessed severe injuries and even deaths resulting from people falling off boats and getting entangled in the propeller, Officer Wineland believed the position of the female passenger on Pettijohn's boat posed a danger to her safety.

As a water patrol officer for the DNR, Officer Wineland had authority to investigate and enforce violations of the law amounting to simple misdemeanors, but not serious misdemeanors. Officer Wineland suspected Pettijohn was committing a simple misdemeanor by operating the pontoon boat in violation of section 462A.12(1) of the Iowa Code, which provides, "No person shall operate any vessel . . . in a careless, reckless or negligent manner so as to endanger the life, limb or property of any person." Iowa Code § 462A.12(1); *id.* § 462A.13 (stating offenses defined in chapter 462A of the Code constitute simple misdemeanors unless otherwise specifically provided).

Officer Wineland decided to stop Pettijohn to inform him that permitting the passenger to sit so close to the unguarded propeller while the boat was in motion posed a danger to her safety. Pettijohn complied with Officer Wineland's request to stop the boat.

While speaking with Pettijohn, Officer Wineland observed that he had bloodshot eyes. He also noticed there were two coolers on the boat. During their conversation, it appeared to Officer Wineland that Pettijohn was nervous and avoided making eye contact with him. These

observations led Officer Wineland to suspect Pettijohn had been operating the boat while intoxicated in violation of Iowa Code section 462A.14(1), a serious misdemeanor he was without authority to investigate. *See id.* § 462A.14(2). Consequently, Officer Wineland sought assistance from conservation officers authorized to investigate serious misdemeanor offenses. In the meantime, Officer Wineland instructed Pettijohn to proceed to the dock to await the arrival of the conservation officers and issued him a warning citation for the negligent operation of the boat. When Officer Wineland explained the reason for the citation, Pettijohn indicated he had not realized a passenger was sitting on the bow of the boat and would not have allowed her to remain there had he known of her location.

Conservation Officers Dakota Drish and Matt Bruner soon arrived. Once aboard Pettijohn's boat, Officer Drish detected the distinct odor of an alcoholic beverage and observed that Pettijohn was slurring his speech and had bloodshot eyes. Based on these observations Officer Drish administered field sobriety tests, the results of which led him to conclude that Pettijohn had been operating the boat while intoxicated. Officer Drish placed Pettijohn in handcuffs, and the officers transported him to the Polk City Police Department.

At the station, Officer Drish read to Pettijohn from a standard form entitled "Implied Consent Advisory" in order to inform him of the consequences of failing a breath test or refusing to consent to a breath test. Pettijohn signed his name in a box labeled "confirmation signature" on the bottom of the form. Minutes later, Officer Drish formally requested a sample of his breath. Pettijohn checked a box on a separate form entitled "Notice and Request Under Iowa Code Section 462A.14," indicating he consented to provide a breath sample upon being requested

to do so after having been read the implied-consent advisory. Pettijohn then submitted to a breath test, which indicated his blood alcohol concentration (BAC) was .194.

The State charged Pettijohn with operating a motorboat while under the influence in violation of Iowa Code section 462A.14(1). Because this was Pettijohn's first offense, the violation constituted a serious misdemeanor criminal offense. *See id.* § 462A.14(2).

## II. Prior Proceedings.

Before the district court, Pettijohn moved to suppress all evidence obtained after Officer Wineland stopped his boat, arguing the stop violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution and article I, section 8 of the Iowa Constitution. Pettijohn also moved to suppress the results of the breath test, arguing the implied-consent procedure he was subjected to violated the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution because (1) it authorizes the imposition of a penalty for the exercise of a constitutional right to refuse a warrantless search, and (2) a person cannot contract away his or her natural right to use the state's navigable waterways. Additionally, Pettijohn argued the breath-test results should be suppressed because the implied-consent advisory was inaccurate and thus (1) violated his substantive due process rights under the Fourteenth Amendment of the United States Constitution and article I, section 9 of the Iowa Constitution; (2) violated his statutory rights under the Iowa Code; and (3) rendered his consent involuntary and coerced in violation of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution.

The district court denied Pettijohn's motion to suppress. First, the court concluded the stop of Pettijohn's boat was authorized under the Fourth Amendment and article I, section 8 because it was justified by the community-caretaking exception to the warrant requirement. Second, the court concluded the administration of a warrantless breath test pursuant to the implied-consent procedure authorized by the Iowa Code violates neither the Fourth Amendment nor article I, section 8. Third, the court concluded any inaccuracies in the implied-consent advisory read to Pettijohn did not induce or coerce his consent in violation of his federal or state substantive due process rights.

Pettijohn waived his right to a jury trial, and the district court convicted him following a bench trial on the minutes. Pettijohn subsequently appealed, and we retained the appeal.

Following oral argument, we held the appeal in abeyance pending a decision from the United States Supreme Court on the issue of whether the Fourth Amendment prohibits implied-consent laws imposing penalties on motorists suspected of drunk driving for their refusal to submit to BAC testing. *See Birchfield v. North Dakota*, 579 U.S. ___, 136 S. Ct. 2160 (2016). After applying a balancing test weighing the degree to which blood tests and breath tests intrude upon individual privacy interests and the degree to which such tests are needed to promote the legitimate government interest in the safety of public highways, the Court held the Fourth Amendment permits the administration of warrantless breath tests, but not the administration of warrantless blood tests, as searches incident to lawful arrests for drunk driving. *Id.* at ___, ___, 136 S. Ct. at 2176–79, 2185. Accordingly, the Court determined state statutes criminalizing the refusal of a motorist arrested on suspicion of

drunk driving to submit to a blood test violate the Fourth Amendment. *Id.* at \_\_\_, 136 S. Ct. at 2185–86.

Following the issuance of the *Birchfield* decision, the parties submitted additional briefs to this court addressing its implications for our resolution of this appeal. Pettijohn argues *Birchfield* does not resolve the question of whether a warrantless breath test may be administered to an individual arrested on suspicion of boating while intoxicated under the Fourth Amendment, as the State's need to ensure the safety of the public waterways is far less compelling than its need to ensure the safety of public highways. He further argues the administration of the warrantless breath test following his arrest on suspicion of boating while intoxicated violated article I, section 8 of the Iowa Constitution because no valid exception to the warrant requirement authorized the warrantless search.

In contrast, the State argues that because implied-consent laws serve the same purpose in the boating context as they serve in the driving context, the Fourth Amendment permits the warrantless administration of a breath test as a search incident to a lawful arrest on suspicion of operating while intoxicated in both contexts. Furthermore, the State argues that even if a warrantless breath test does not constitute a search incident to a lawful arrest in the boating context, because Pettijohn faced only the possibility of civil penalties and evidentiary consequences for refusal to submit, the procedure invoked prior to the administration of the breath test did not violate the Fourth Amendment. Finally, the State argues article I, section 8 permits the administration of a warrantless breath test as a search incident to the lawful arrest of an individual suspected of boating while intoxicated

because the interests justifying such a search relate primarily to evidence preservation.

### III. Issues on Appeal.

We first consider whether the seizure of the boat Pettijohn was operating violated the Fourth Amendment to the United States Constitution or article I, section 8 of the Iowa Constitution. We next consider whether administering a warrantless breath test on an individual arrested on suspicion of boating while intoxicated violates the Fourth Amendment or article I, section 8. Finally, we consider whether Pettijohn effectively consented to the warrantless breath test. Because we conclude he did not, admission of the breath test results violated article I, section 8. Therefore, we do not reach Pettijohn's due process and statutory claims.

### IV. Standard of Review.

"We review constitutional claims de novo." *Hensler v. City of Davenport*, 790 N.W.2d 569, 578 (Iowa 2010). To the extent a constitutional claim raises issues of statutory interpretation, however, our review is for correction of errors at law. *State v. Allen*, 708 N.W.2d 361, 365 (Iowa 2006).

### V. The Statutory Provisions.

Chapter 462A of the Iowa Code contains the boating-while-intoxicated statutes. Section 462A.14B defines the penalties that apply when a person refuses to submit to a chemical test "for the purpose of determining the alcohol concentration or presence of controlled substances or other drugs." Iowa Code § 462A.14A(1). It provides,

> 1. If a person refuses to submit to the chemical testing, a test shall not be given unless the procedure in section 462A.14D is invoked. However, if the person refuses

the test, the person shall be punishable by the court according to this section.

> 2. The court, upon finding that the officer had reasonable ground to believe the person to have been operating a motorboat or sailboat in violation of section 462A.14, that specified conditions existed for chemical testing pursuant to section 462A.14A, and that the person refused to submit to the chemical testing, shall:
>
> *a.* Order that the person shall not operate a motorboat or sailboat for one year.
>
> *b.* Impose a mandatory civil penalty as follows:
>
> (1) For a first refusal under this section, five hundred dollars.
>
> (2) For a second refusal under this section, one thousand dollars.
>
> (3) For a third or subsequent refusal under this section, two thousand dollars.
>
> 3. If the person does not pay the civil penalty by the time the one-year order not to operate expires, the court shall extend the order not to operate a motorboat or sailboat for an additional year, and may also impose penalties for contempt.

*Id.* § 462A.14B(1)–(3). In addition to these penalties, "proof of refusal is admissible in any civil or criminal action or proceeding arising out of acts alleged to have been committed while the person was operating a motorboat or sailboat in violation of section 462A.14." *Id.* § 462A.14A(8).

The Code also addresses the advisory an officer must administer when requesting an individual suspected of boating while intoxicated to submit to a chemical test. *Id.* §§ 462A.14A(4)(*g*), .14C(1). Specifically, section 462A.14A(4)(*g*) provides,

> *g.* A person who has been requested to submit to a chemical test shall be advised by a peace officer of the following:

(1) A refusal to submit to the test is punishable by a mandatory civil penalty of five hundred to two thousand dollars, and suspension of motorboat or sailboat operating privileges for at least a year. In addition, if the person is also convicted of operating a motorboat or sailboat while intoxicated, the person shall be subject to additional penalties.

(2) If the person submits to the test and the results indicate an alcohol concentration equal to or in excess of the level prohibited under section 462A.14 and the person is convicted, the person's motorboat or sailboat operating privileges will be suspended for at least one year and up to six years, depending upon how many previous convictions the person has under this chapter, and whether or not the person has caused serious injury or death, in addition to any sentence and fine imposed for a violation of section 462A.14.

*Id.* § 462A.14A(4)(*g*)(1)–(2). Similarly, section 462A.14C provides,

1. A person who has been requested to submit to a chemical test shall be advised by a peace officer of the following:

*a.* A refusal to submit to the test is punishable by a mandatory civil penalty of five hundred to two thousand dollars, and suspension of motorboat or sailboat operating privileges for at least a year. In addition, if the person is also convicted of operating a motorboat or sailboat while intoxicated, the person shall be subject to additional penalties.

*b.* If the person submits to the test and the results indicate the presence of a controlled substance or other drug, or an alcohol concentration equal to or in excess of the level prohibited by section 462A.14, the person's privilege to operate a motorboat or sailboat will be prohibited for at least one year, and up to six years.

*Id.* § 462A.14C(1)(*a*)–(*b*).[1]

---

[1]We acknowledge that the advisories mandated by sections 462A.14C(1)(*b*) and 462A.14A(4)(*g*)(2) of the Code do not precisely match. However, we need not contemplate the potential significance of these differences in resolving this appeal.

**VI. The Implied-Consent Advisory.**

The following text appeared on the form Pettijohn signed containing the implied-consent advisory Officer Drish read to him:

Implied Consent Advisory:

(If any peace officer fails to offer a test within two hours the preliminary screening test is administered or refused, or the arrest is made, whichever occurs first, a test is not required, and there shall be no suspension of motorboat or sail boat operation privileges.)

Notice to Any Peace Officer

A person who has been requested to submit to a chemical test shall be advised by a peace officer of the following:

(1) A refusal to submit to the test is punishable by a mandatory civil penalty of five hundred to two thousand dollars, and suspension of motorboat or sailboat operating privileges for at least a year.  In addition, if the person is also convicted of operating a motorboat or sailboat while intoxicated, the person shall be subject to additional penalties.[2]

(2)  If the person submits to the test and the results indicate the presence of a controlled substance or other drug, or an alcohol concentration equal to or in excess of the level prohibited under section 462A.14 (.08 BAC) and the person is convicted, the person's motorboat or sailboat operating privileges will be suspended for at least one year and up to six years, depending upon how many previous convictions the person has under this chapter, and whether or not the person has caused serious injury or death, in addition to any sentence and fine imposed for a violation of section 462A.14[.][3]

**VII. The Constitutional Provisions.**

Article I, section 8 of the Iowa Constitution guarantees,

---

[2]Subparagraph (1) of the advisory matched verbatim the text appearing in sections 462A.14C(1)(*a*) and 462A.14A(4)(*g*)(1) of the Code.

[3]Subparagraph (2) of the advisory combined language appearing in sections 462A.14A(4)(*g*)(2) and 462A.14C(1)(*b*) of the Code.

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Iowa Const. art. I, § 8. The federal counterpart to article I, section 8 is the Fourth Amendment to the United States Constitution, which was made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 654–55, 81 S. Ct. 1684, 1691 (1961). The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Though the rights set forth in these provisions apply to all, questions concerning their scope ordinarily arise in circumstances in which individuals are suspected of engaging in criminal behavior. *State v. King*, 867 N.W.2d 106, 110–11 (Iowa 2015).

Warrantless searches and seizures are per se unreasonable unless one of several carefully drawn exceptions to the warrant requirement applies. *State v. Lewis*, 675 N.W.2d 516, 522 (Iowa 2004); *State v. Kinkead*, 570 N.W.2d 97, 100 (Iowa 1997). To establish the constitutionality of a warrantless search or seizure, the State must prove by a preponderance of the evidence that a recognized exception to the warrant requirement applies. *State v. Simmons*, 714 N.W.2d 264, 272 (Iowa 2006).

## VIII. The Constitutionality of the Seizure.

The district court apparently concluded the seizure of the boat Pettijohn was operating constituted a valid exercise of the community-

caretaking exception to the warrant requirement. Assessing whether the community-caretaking exception to the warrant requirement justified a seizure requires a court to determine (1) whether the officer who effected the seizure was engaged in a bona fide community-caretaking activity and (2) whether the public need and interest outweighed the intrusion upon the privacy of the citizen subject to a seizure. *State v. Kern*, 831 N.W.2d 149, 173 (Iowa 2013). Community-caretaking activities are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 172 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973)).

We need not reach the question of whether the community-caretaking exception to the warrant requirement authorized the seizure at issue in this case, however. Rather, we affirm the district court ruling that the seizure was constitutional based on an alternate ground urged by the State below and fully briefed and argued by the parties on appeal. *See, e.g., In re Estate of Voss*, 553 N.W.2d 878, 879 n.1 (Iowa 1996); *Johnston Equip. Corp. v. Indus. Indem.*, 489 N.W.2d 13, 17 (Iowa 1992); *see also Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375, 378 (Iowa 1986). Specifically, we conclude the warrantless seizure of the boat Pettijohn was operating was constitutionally authorized because Officer Wineland reasonably suspected that Pettijohn was violating Iowa Code section 462A.12(1).

One established exception to the warrant requirement permits an officer with "a reasonable, articulable suspicion that a criminal act has occurred, is occurring, or is about to occur" to stop an individual for investigatory purposes. *State v. Vance*, 790 N.W.2d 775, 780 (Iowa 2010). To prove an investigatory stop complies with the requirements of

this exception, however, the State must prove by a preponderance of the evidence that the officer reasonably believed criminal activity was afoot based on "specific and articulable facts . . . taken together with rational inferences from those facts." *Id.* at 781. We determine whether reasonable suspicion existed in light of the totality of the circumstances confronting the officer, "including all information available to the officer at the time the decision to stop is made." *Id.* (quoting *State v. Kreps*, 650 N.W.2d 636, 642 (Iowa 2002)).

Here, Officer Wineland believed Pettijohn was engaged in an ongoing misdemeanor because he was endangering the safety of a passenger on the boat he was operating in violation of the Iowa Code. The Code provides, "No person shall operate any vessel, or manipulate any water skis, surfboard or similar device in a careless, reckless or negligent manner so as to endanger the life, limb or property of any person." Iowa Code § 462A.12(1). Pettijohn argues a person must endanger life, limb, or property by *driving* a boat in a careless, reckless, or negligent manner to violate this statute. We disagree.

When we interpret a statute, our goal is to determine legislative intent. *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004). To determine legislative intent, we look at the words the legislature chose when it enacted the statute, not the words it might have chosen. *Ramirez-Trujillo v. Quality Egg, L.L.C.*, 878 N.W.2d 759, 770 (Iowa 2016). When the legislature chooses to "act as its own lexicographer" by defining a statutory term, we are ordinarily bound by its definition. *Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 425 (Iowa 2010) (quoting *State v. Fischer*, 785 N.W.2d 697, 702 (Iowa 2010)). When the legislature fails to define a statutory term, we examine the context in which the term appears and accord the term its

ordinary and common meaning. *Ramirez-Trujillo*, 878 N.W.2d at 770. Interpreting a statute requires us to assess it in its entirety to ensure our interpretation is harmonious with the statute as a whole rather than assessing isolated words or phrases. *Id.*

For purposes of section 462A.12(1), the legislature has defined the word "operate" to mean "to navigate or otherwise use a vessel or motorboat." Iowa Code § 462A.2(24). The common meaning of "navigate" is to "direct one's course through any medium." *Navigate, Webster's Third New International Dictionary* (unabr. ed. 2002). Were this the only legislative definition of the word "operate" appearing in chapter 462A, it would arguably support interpreting the statute narrowly as Pettijohn suggests.

However, according to the definition of the term "operate" the legislature adopted, a person operates a boat when they navigate it "or otherwise use" it. Iowa Code § 462A.2(24). The common meaning of the word "otherwise" is "in a different way or manner." *Otherwise, Webster's Third New International Dictionary.* The common meaning of the word "use" is "to put into action or service." *Use, Webster's Third New International Dictionary.* Because the legislature incorporated the phrase "otherwise use" in the statutory definition of the word "operate," we conclude the legislature intended the prohibition in section 462A.12(1) to apply any time a person uses a boat "in a careless, reckless or negligent manner so as to endanger . . . life, limb or property," even if the person is navigating the boat safely. To illustrate, navigating a boat while it was carrying weight in excess of its maximum weight capacity would clearly constitute a violation of section 462A.12(1).

Here, Pettijohn was operating the pontoon boat with a passenger in close proximity to an unguarded propeller. If Pettijohn had made a

sudden maneuver, his passenger could have slipped off the boat and into the propeller. Under these circumstances, Officer Wineland had a reasonable, articulable suspicion that Pettijohn was engaged in the crime defined in section 462A.12(1). Therefore, we conclude the seizure of the boat violated neither the Fourth Amendment to the United States Constitution nor article I, section 8 of the Iowa Constitution.

## IX. The Constitutionality of the Search Under the United States Constitution.

We begin our analysis concerning the constitutionality of the breath test by examining the recent decision of the United States Supreme Court addressing the constitutionality of implied-consent searches. In *Birchfield*, the Court considered "whether motorists lawfully arrested for drunk driving may be convicted of a crime or otherwise penalized for refusing to take a warrantless test measuring the alcohol in their bloodstream" consistent with the Fourth Amendment to the United States Constitution. 579 U.S. at ___, 136 S. Ct. at 2172. The three petitioners whose consolidated cases the Court addressed each advanced the argument "that the criminal law ordinarily may not compel a motorist to submit to the taking of a blood sample or to a breath test unless a warrant authorizing such testing is issued by a magistrate." *Id.* The Court noted that when

> such warrantless searches comport with the Fourth Amendment, it follows that a State may criminalize the refusal to comply with a demand to submit to the required testing, just as a State may make it a crime for a person to obstruct the execution of a valid search warrant.

*Id.* As a result, the Court set out to determine whether the administration of warrantless blood and breath tests is justified by an exception to the Fourth Amendment warrant requirement when an

individual has been lawfully arrested on suspicion of drunk driving. *Id.* at ___, 136 S. Ct. at 2173–74.

The Court first noted the exigent-circumstances exception to the warrant requirement, which "allows a warrantless search when an emergency leaves police insufficient time to seek a warrant," does not categorically permit warrantless BAC testing in drunk-driving investigations. *Id.* at ___, 136 S. Ct. at 2173–74. Rather, the question of whether the natural dissipation of alcohol from the bloodstream constitutes an exigency justifying a warrantless BAC test must be determined by careful case-by-case assessment of "all of the facts and circumstances of the particular case." *Id.* at ___, 136 S. Ct. at 2174 (quoting *Missouri v. McNeely*, 569 U.S. 141, 151, 133 S. Ct. 1552, 1560 (2013) (plurality opinion)). The Court emphasized the exigent-circumstances exception to the warrant requirement, unlike other exceptions to the warrant requirement, must be applied in a case-specific fashion, not categorically. *Id.*

The Court next considered whether the search-incident-to-arrest doctrine applies to breath and blood tests incident to drunk-driving arrests. *Id.* After acknowledging its prior decisions applying this doctrine have not been "easy to reconcile" and describing its scope during colonial times, the Court ultimately determined the question of whether the doctrine applies "does not depend on whether a search of a *particular* arrestee is likely to protect officer safety or evidence." *Id.* at ___, 136 S. Ct. at 2175–76. However, when the doctrine applies, the Court noted, the very "fact of the lawful arrest" permits "a full search of the person." *Id.* at ___, 136 S. Ct. at 2176 (quoting *United States v. Robinson*, 414 U.S. 218, 235, 94 S. Ct. 467, 477 (1973)).

The Court next described the appropriate test for determining whether the doctrine "should be applied in situations that could not have been envisioned when the Fourth Amendment was adopted." *Id.* "Absent more precise guidance from the founding era," the Court concluded such determinations should ordinarily be made "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* (quoting *Riley v. California*, 573 U.S. ___, ___, 134 S. Ct. 2473, 2484 (2014)).

Lacking "any definitive guidance" from the founding era as to whether blood and breath tests to measure BAC should be permitted incident to arrest, the Court then undertook to apply this test. *Id.* With respect to the degree to which BAC testing intrudes upon individual privacy interests, the Court distinguished between blood and breath tests, concluding blood tests implicate more significant privacy concerns than breath tests. *Id.* at ___, 136 S. Ct. at 2176–78.

As for the question of whether BAC testing on persons arrested for drunk driving promotes a legitimate governmental interest, the Court determined states have compelling interests in both "neutralizing the threat posed" by drunk drivers behind the wheel and deterring drunk driving effectively. *Id.* at ___, 136 S. Ct. at 2178–79. Accordingly, the Court found implied-consent laws that induce motorists suspected of drunk driving to submit to BAC testing "serve a very important function" even *after* those motorists have been arrested and removed from the road. *Id.* at ___, 136 S. Ct. at 2179. In doing so, the Court described alcohol consumption as "a leading cause of traffic fatalities and injuries" and emphasized statistics prepared by the National Highway Traffic Safety Administration (NHTSA) indicating the number of fatalities in

accidents attributed to drunk driving in recent years "ranged from 13,582 deaths in 2005 to 9,865 deaths in 2011." *Id.* at ___, 136 S. Ct. at 2178.

In assessing the degree to which implied-consent laws imposing penalties for refusal to submit to BAC testing are necessary to promote the legitimate governmental interests related to assuring roadway safety, the Court rejected the relevance of determining whether "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search" in the particular case. *Id.* at ___, 136 S. Ct. at 2179. Rather, the Court concluded the applicability of the search-incident-to-arrest exception "has never turned on case-specific variables such as how quickly the officer will be able to obtain a warrant in the particular circumstances he faces." *Id.* at ___, 136 S. Ct. at 2180. The Court dismissed "alternatives to warrantless BAC tests incident to arrest" as "poor substitutes" for implied-consent laws because many other strategies available to combat drunk driving are "significantly more costly," "target[ed to] only a segment of the drunk-driver population," "already in widespread use," or less effective than more severe penalties for refusal. *Id.* at ___, 136 S. Ct. at 2182.

Finally, because the Court determined requiring warrants for BAC testing would impose a burden on the states, it concluded the petitioners needed to support their claims by demonstrating "some special need for warrants for BAC testing." *Id.* at ___, 136 S. Ct. at 2181. In assessing whether the petitioners had met that standard, the Court described the benefits requiring warrants would provide as follows:

> Search warrants protect privacy in two main ways. First, they ensure that a search is not carried out unless a neutral magistrate makes an independent determination that there is probable cause to believe that evidence will be found.

> Second, if the magistrate finds probable cause, the warrant limits the intrusion on privacy by specifying the scope of the search—that is, the area that can be searched and the items that can be sought.

*Id.* at ___, 136 S. Ct. at 2181 (citation omitted). The Court then concluded the petitioners had not demonstrated a special need for warrants before BAC testing is conducted. *Id.* at ___, 136 S. Ct. at 2181–82. More precisely, the Court determined "requiring the police to obtain a warrant in every case would impose a substantial burden but no commensurate benefit" because the facts officers would need to recite to establish probable cause for a warrant would "consist largely of the officer's own characterization of his or her observations" and the scope of search permitted by the warrant would be the same in every case. *Id.*

Balancing these considerations, the Court held the Fourth Amendment permits the administration of a warrantless breath test, but not a blood test, to determine the BAC of an individual lawfully arrested on suspicion of drunk driving as a search incident to arrest. *Id.* at ___, 136 S. Ct. at 2184–85. However, the Court cautioned a warrantless blood test may be justified under another exception to the warrant requirement, stating,

> Nothing prevents the police from seeking a warrant for a blood test when there is sufficient time to do so in the particular circumstances or from relying on the exigent circumstances exception to the warrant requirement when there is not.

*Id.* at ___, 136 S. Ct. at 2184.

Pettijohn argues applying the balancing test the *Birchfield* Court used to determine whether the search-incident-to-arrest exception applies to arrests for drunk driving yields a different result in the context of drunk boating for two reasons. First, he argues the individual interest at stake in the boating context is more significant than in the driving

context because a person has a natural right to navigate state waterways and does not need a license to operate a boat. Second, he argues the government interest in preventing drunk boating is far less compelling than the government interest in preventing drunk driving.

We reject this analysis. First, in determining whether the search-incident-to-arrest exception to the Fourth Amendment right to be free from unreasonable searches applies, the individual interest to be assessed is the degree to which a warrantless search will intrude upon his or her privacy interests. Second, though government statistics indicate drunk boating causes far fewer annual fatalities than drunk driving, we conclude the government interest in preventing and deterring injuries and fatalities is similar in the drunk driving and the drunk boating contexts. Though we acknowledge government statistics suggest drunk boating causes far fewer annual fatalities than drunk driving, alcohol is the leading known contributing factor in both fatal boating accidents and fatal motor vehicle accidents.

Applying *Birchfield,* we conclude the Fourth Amendment permits the administration of a warrantless breath test to determine the BAC of an individual lawfully arrested on suspicion of boating while intoxicated. The BAC test at issue in this case was a breath test rather than a blood test, and Officer Drish administered it after reading an implied-consent advisory to Pettijohn following his lawful arrest. Therefore, we conclude the breath test constituted a search incident to arrest excepted from the Fourth Amendment's warrant requirement under *Birchfield.*

**X. The Constitutionality of the Search Under the Iowa Constitution.**

The text of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution are "nearly

identical." *State v. Short*, 851 N.W.2d 474, 500 (Iowa 2014). However, the scope of the protections they afford is not. *See, e.g.*, *State v. Gaskins*, 866 N.W.2d 1, 13 (Iowa 2015); *Short*, 851 N.W.2d at 506; *State v. Ochoa*, 792 N.W.2d 260, 291 (Iowa 2010).

"We jealously guard our right to construe a provision of our state constitution differently than its federal counterpart, though the two provisions may contain nearly identical language and have the same general scope, import, and purpose." *State v. Jackson*, 878 N.W.2d 422, 442 (Iowa 2016); *see State v. Kooima*, 833 N.W.2d 202, 206 (Iowa 2013). Additionally, whether or not a defendant has advanced the argument that a different framework applies to a state constitutional claim than federal cases have used in parallel federal constitutional claims, we reserve our right to apply a federal standard more stringently than it is applied in federal caselaw when construing the requirements of our state constitution. *Jackson*, 878 N.W.2d at 442; *Kooima*, 833 N.W.2d at 206.

**A. Searches Incident to Arrest Under Article I, Section 8.** Our caselaw recognizes the search-incident-to-arrest exception to the warrant requirement under article I, section 8 "must be narrowly construed and limited to accommodating only those interests it was created to serve." *Gaskins*, 866 N.W.2d at 8 (quoting *State v. McGrane*, 733 N.W.2d 671, 677 (Iowa 2007)). Applying this principle, in *Gaskins* we held the scope of the search-incident-to-arrest exception to the warrant requirement under article I, section 8 of the Iowa Constitution is narrower than its scope under the Fourth Amendment to the United States Constitution. *Id.* at 13–14.

Our decision in *Gaskins* addressed the extent to which the proper scope of the search-incident-to-arrest exception to the warrant requirement under article I, section 8 is limited by its underlying

purposes. *Id.* at 8–16. In considering this question, we concluded, "When lines need to be drawn in creating rules, they should be drawn thoughtfully along the logical contours of the rationales giving rise to the rules." *Id.* at 12 (quoting *State v. Rowell*, 188 P.3d 95, 101 (N.M. 2008)). Accordingly, we determined the proper scope of the search-incident-to-arrest exception "is tethered to its original underlying dual justifications." *Id.* at 16. We thus held a proper search incident to arrest under article I, section 8 must serve either the purpose of "protecting arresting officers" or "safeguarding any evidence the arrestee may seek to conceal or destroy." *Id.* at 8 (quoting *Vance*, 790 N.W.2d at 786). We also clarified that in order for the preservation of evidence to justify a warrantless search incident to arrest under the Iowa Constitution, the search must serve "the State's interest in preserving evidence from destruction," not merely its interest in collecting evidence expediently. *Id.* at 14.

In concluding a warrantless search incident to arrest justified by the need to preserve evidence must serve the purpose of preventing evidence destruction under article I, section 8, we squarely rejected the proposition that collecting "evidence of the crime of arrest" constitutes a sufficient justification to support a warrantless search under article I, section 8. *Id.* at 13–14. Notwithstanding the contrary position taken by the United States Supreme Court in *Arizona v. Gant*, 556 U.S. 332, 351, 129 S. Ct. 1710, 1723 (2009), we rejected this general evidence-gathering rationale as the proper limitation for the permissible scope of searches incident to arrest under article I, section 8. *Gaskins*, 866 N.W.2d at 13. Instead, we concluded the general evidence-gathering rationale approved in *Gant* stood "wholly separate from" the underlying justifications for the search-incident-to-arrest exception to the warrant requirement such that it was "repugnant to article I, section 8 of the Iowa Constitution." *Id.* at

13–14. We reasoned that allowing warrantless searches incident to arrest based on the need to gather evidence would cause the search-incident-to-arrest exception "to swallow completely the fundamental textual rule in article I, section 8 that searches and seizures should be supported by a warrant." *Id.* at 13. We emphasized our holding would not preclude warrantless searches following an arrest when "the security of an arresting officer is implicated," "the arrested person is within reach of contraband and thus able to attempt to destroy or conceal it," or unusual circumstances supporting the application of the exigent-circumstances exception to the warrant requirement exist. *Id.* at 15.

Of course, when the Iowa Constitution is more protective against government intrusion than the United States Constitution, we must determine whether the government conduct at issue in a particular case violated individual rights guaranteed under our state constitution. Therefore, we must now determine whether the breath test administered on Pettijohn was justified as a search incident to arrest under article I, section 8 as construed in *Gaskins.*

Relying on our language acknowledging "the important distinction between the purpose of preserving evidence and the purpose of collecting evidence" in *Gaskins, id.* at 14, the State argues the evanescent nature of BAC evidence places breath tests squarely within the scope of the search-incident-to-arrest exception to the warrant requirement under article I, section 8.

We recognize "that as a result of the human body's natural metabolic processes, the alcohol level in a person's blood begins to dissipate once the alcohol is fully absorbed and continues to decline until the alcohol is eliminated." *McNeely*, 569 U.S. at 152, 133 S. Ct. at 1560. We have applied this very concept in interpreting our state statutes well

before the United States Supreme Court decided *McNeely*. *See State v. Harris*, 763 N.W.2d 269, 274 (Iowa 2009) (holding the mere dissipation of alcohol in a person's bloodstream was not enough to allow a warrantless search to obtain the driver's blood alcohol level under our OWI statutes); *State v. Johnson*, 744 N.W.2d 340, 344–45 (Iowa 2008) (holding the mere dissipation of alcohol in a person's bloodstream with exigent circumstances was enough to allow a warrantless search to obtain the driver's blood alcohol level under our OWI statutes); *see also State v. Lovig*, 675 N.W.2d 557, 567 (Iowa 2004) (holding police could not enter a home and obtain a chemical test to determine a person's blood alcohol level under the Fourth Amendment merely because the driver's "blood-alcohol level might have dissipated while the police obtained a warrant"). We therefore have acknowledged the evanescent nature of BAC evidence.

However, it is apparent the evanescent nature of BAC evidence does not make it susceptible to concealment or destruction by an arrestee. Plainly, there was nothing Pettijohn could have done to conceal or destroy the alcohol present in his blood. In *Gaskins*, we acknowledged evidence preservation constitutes a justification for warrantless searches incident to arrest only insofar as they serve the purpose of preventing the destruction or concealment of evidence by an arrestee. 866 N.W.2d at 14. We specifically disavowed the notion that the state interest in collecting evidence expediently, as opposed to the state interest in preventing evidence from being intentionally destroyed by an arrestee, constitutes an adequate justification for a search incident to arrest. *Id.*

In essence, the State asks us to hold that the proper scope of searches incident to arrest justified by evidence preservation under article I, section 8 extends not only to evidence the arrestee might conceal or destroy, but also to other evidence that might be lost due to

its natural dissipation as part of an arrestee's metabolic processes. We have previously rejected this claim under our statutory scheme. *Harris*, 763 N.W.2d at 274. Additionally, we have rejected this claim under the Fourth Amendment. *Lovig*, 675 N.W.2d at 567. For the following reasons, we also reject the notion that the natural dissipation of alcohol justifies the per se application of the search-incident-to-arrest exception to the warrant requirement under article I, section 8.

The implied-consent statute in chapter 462A establishes evidentiary presumptions applicable to BAC evidence obtained by breath tests taken up to two hours after an arrestee is observed operating a boat that ensure the results of tests taken within this window will constitute powerful evidence supporting a conviction under section 462A.14. Under the implied-consent procedure set forth in the Code,

> alcohol concentration established by the results of an analysis of a specimen of the defendant's blood, breath, or urine withdrawn *within two hours* after the defendant was operating or was otherwise in physical control of a motorboat or sailboat is presumed to be the alcohol concentration at the time of operation or being in physical control of the motorboat or sailboat.

Iowa Code § 462A.14A(8) (emphasis added); *see id.* § 462A.14(8)(*a*). Moreover, section 462A.14 prohibits not only operating a boat with a blood alcohol concentration equal to ".08 or more," but also operating a boat "under the influence of an alcoholic beverage or other drug or a combination of such substances." *Id.* § 462A.14(1)(*a*)–(*b*). Thus, when combined with officer testimony concerning the facts that created the probable cause for arresting a defendant in the first place, test results confirming the presence of *any* alcohol in the defendant's blood might be enough to establish a violation of section 462A.14.

The evidentiary presumption established in the implied-consent procedure set forth in sections 462A.14 and 462A.14A accounts for delays inherent to obtaining trial-worthy BAC evidence. For example, officers generally conduct evidentiary breath tests on arrestees only after transporting them to either "a police station, governmental building, or mobile testing facility where officers can access reliable, evidence-grade breath testing machinery." *Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2192 (Sotomayor, J., dissenting). An officer must also observe an arrestee for fifteen to twenty minutes before administering a breath test in order to ensure the arrestee has not "inserted any food or drink into his mouth" and "to ensure that 'residual mouth alcohol,' which can inflate results and expose the test to an evidentiary challenge at trial, has dissipated." *Id.* (quoting NHTSA & Int'l Ass'n of Chiefs of Police, DWI Detection and Standardized Field Sobriety Testing Participant Guide, Session 7, p. 20 (2013)). Finally, when an officer arrives at an adequately equipped testing location, "if a breath test machine is not already active, the . . . officer must set it up." *Id.* Because these steps are necessary to obtaining reliable BAC evidence, "the standard breath test is conducted well after an arrest is effectuated." *Id.*

During this necessary window of delay, law enforcement officers who wish to conduct a breath test on an arrestee can seek a warrant electronically. In Iowa, law enforcement officers have "the capability to access the court system from the computer in a police vehicle to request a search warrant based on probable cause at all times of the day and night." *Gaskins*, 866 N.W.2d at 17 (Cady, C.J., concurring specially). This expanded access to the courts enables law enforcement officers throughout the state to obtain search warrants more quickly than ever before. Furthermore, in the context of arrests for operating while

intoxicated, the facts establishing probable cause to obtain a search warrant "are largely the same from one . . . stop to the next and consist largely of the officer's own characterization of his or her observations." *Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2181 (majority opinion). Because documenting the facts needed to establish probable cause is relatively simple in this context, an officer who has probable cause to suspect an individual of operating while intoxicated should ordinarily be able to complete and submit an electronic warrant application within minutes.

This reasoning is consistent with Iowa constitutional jurisprudence. Whenever practicable, the state should obtain a warrant prior to conducting a search. *See Gaskins*, 866 N.W.2d at 16 (holding a search warrant is generally required before a search); *Ochoa*, 792 N.W.2d at 285 (holding under the Iowa Constitution we have a warrant-preference requirement); *see also Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879 (1968) ("We do not retreat from our holdings that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure . . . ."). A recognized exception to the warrant requirement is when there is probable cause and exigent circumstances.[4] The state cannot create an exigent circumstance and profit by it against a defendant's rights under our search and seizure jurisprudence. *See State v. Ahern*, 227 N.W.2d 164, 168 (Iowa 1975). The legislature does allow police officers to obtain telephonic search warrants in certain instances. *See* Iowa Code § 321J.10(3). Our electronic document management system (EDMS)

---

[4]We will discuss exigent circumstances in regard to the dissipation of alcohol in the bloodstream later in this opinion.

allows the police to get a warrant almost instantaneously. The failure of the state to authorize such a procedure cannot create an exigency.

Moreover, the Iowa Code allows unsworn statements to be the basis of an affidavit for issuance of a search warrant. The Code provides in relevant part,

> When the laws of this state or any lawful requirement made under them requires or permits a matter to be supported by a sworn statement written by the person attesting the matter, the person may attest the matter by an unsworn written statement if that statement recites that the person certifies the matter to be true under penalty of perjury under the laws of this state, states the date of the statement's execution and is subscribed by that person.

Iowa Code § 622.1. By submitting a statement with the proper certification to a magistrate electronically, a magistrate can issue the warrant under Iowa Code section 808.3.

Given that law enforcement officers in Iowa have around-the-clock access to our electronic court system,[5] "the delays inherent in administering reliable breath tests generally provide ample time to obtain a warrant" within the two-hour window that will entitle their results to the evidentiary presumption set forth in section 462A.14A(8). *Birchfield*, 479 U.S. at ___, 136 S. Ct. at 2191 (Sotomayor, J., dissenting). Thus, the evidentiary presumption set forth in the implied-consent procedure defined in chapter 462A ensures the evanescent nature of BAC evidence will ordinarily present no immediate risk of evidence loss sufficient to

---

[5]To the extent law enforcement claims they cannot use the system to access a warrant, the legislature can make any changes to the law that would allow a judicial officer to issue a warrant under our EDMS, as the legislature has allowed the issue of telephonic warrants in certain OWI cases. *See* Iowa Code § 321J.10.

threaten the State's ability to obtain a successful prosecution under section 462A.14(1).[6]

As the Supreme Court repeatedly emphasized in *Birchfield*, when the search-incident-to-arrest exception to the warrant requirement applies, it provides law enforcement officers with "categorical" authority to conduct warrantless searches. *Id.* at \_\_\_, \_\_\_, \_\_\_, 136 S. Ct. at 2174, 2179, 2183 (majority opinion). Thus, an officer's ability to conduct a warrantless search incident to arrest "does not depend on an evaluation of the threat to officer safety or the threat of evidence loss in a particular case." *Id.* at \_\_\_, 136 S. Ct. at 2183. It naturally follows that the recognition of "categorical exceptions" to the warrant requirement is appropriate only "where the commonalities among a class of cases justify dispensing with the warrant requirement for all of those cases, regardless of their individual circumstances." *Id.* at \_\_\_, 136 S. Ct. at 2188 (Sotomayor, J., dissenting).

For this reason, we previously concluded the proper scope of a categorical search-incident-to-arrest exception to the warrant requirement is limited to situations in which the commonalities among a class of cases indicate the application of the exception to that category of cases would satisfy the underlying purposes justifying its existence. *See Gaskins*, 866 N.W.2d at 13. Here, the State offers no evidence to

---

[6]We acknowledge the implied-consent statute set forth in chapter 462A specifically does not bar

> the introduction of any competent evidence bearing on the question of whether a person was under the influence of an alcoholic beverage or a controlled substance or other drug, including the results of chemical tests of specimens of blood, breath, or urine obtained more than two hours after the person was operating a motorboat or sailboat.

Iowa Code §§ 462A.14(11), .14A(8).

plausibly support the conclusion that commonalities serving the underlying purposes of the search-incident-to-arrest exception to the warrant requirement exist across all cases in which an officer seeks to administer a breath test to determine the BAC of an arrestee suspected of violating section 462A.14. In the absence of such evidence, the application of the categorical search-incident-to-arrest exception to the warrant requirement to this class of cases would eviscerate the protections guaranteed by article I, section 8.

We therefore decline the State's invitation to conclude the search-incident-to-arrest exception applies to this category of cases across the board. Under article I, section 8, mere inconvenience resulting from the requirement that officers obtain warrants before conducting searches is inadequate to support the application of the search-incident-to-arrest exception to the warrant requirement. *See id.* at 15. Therefore, assuming the search-incident-to-arrest exception under article I, section 8 is at all concerned with the State's interest in preventing the loss of evanescent evidence, that concern justifies its application only insofar as such loss would occur before a warrant could ordinarily be obtained. The mere fact an individual suspected of boating while intoxicated has been arrested does not reliably indicate this circumstance exists, therefore it does not reliably indicate the existence of a threat to the State's interest in evidence preservation sufficient to justify application of the search-incident-to-arrest exception to the warrant requirement under article I, section 8.

We note the dissipation of alcohol from the bloodstream may support the determination that exigent circumstances exist to justify a warrantless breath test on an arrestee suspected of operating a boat while intoxicated. Though "experts can work backwards from the BAC at

the time the sample was taken to determine the BAC at the time of the alleged offense, longer intervals may raise questions about the accuracy of the calculation." *McNeely*, 569 U.S. at 156, 133 S. Ct. at 1563. Thus, when unusual circumstances arise that make an officer obtaining a warrant within two hours of witnessing the arrestee operating a boat impracticable, they may support the determination that exigent circumstances exist to justify the administration of a warrantless breath test. *See* Iowa Code §§ 462A.14(8)(*a*), .14A(8). As the Supreme Court stated in *McNeely*,

> We by no means claim that telecommunications innovations have, will, or should eliminate all delay from the warrant-application process. Warrants inevitably take some time for police officers or prosecutors to complete and for magistrate judges to review. . . . And improvements in communications technology do not guarantee that a magistrate judge will be available when an officer needs a warrant after making a late-night arrest.

569 U.S. at 155, 133 S. Ct. at 1562.

However, as the State rightly concedes, the natural dissipation of alcohol in the bloodstream and the potential loss of BAC evidence do not automatically constitute exigent circumstances that subvert the warrant requirement under the Fourth Amendment or article I, section 8. *See Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2174; *McNeely*, 569 U.S. at 151–52, 133 S. Ct. at 1560–61, 1563; *Harris*, 763 N.W.2d at 272. "In short, while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, . . . it does not do so categorically." *McNeely*, 569 U.S. at 156, 133 S. Ct. at 1563. In our view, this fact fatally undermines the State's argument, as we perceive no meaningful distinction between concluding the natural dissipation of alcohol justifies the application of the search-incident-to-arrest exception to the warrant requirement in every case involving an arrestee suspected of operating

while intoxicated and concluding it constitutes a per se exigency permitting warrantless searches in such cases.[7]

We therefore conclude a warrantless breath test to determine the BAC of an arrestee suspected of operating a boat while intoxicated does not fall within the search-incident-to-arrest exception to the warrant requirement under article I, section 8. Thus, because the natural dissipation of alcohol does not justify the per se application of the search-incident-to-arrest exception to the warrant requirement under article I, section 8, we conclude the breath test Officer Drish administered to Pettijohn did not constitute a permissible search incident to arrest under the Iowa Constitution.

**B. Consent to a Warrantless Search Under Article I, Section 8.** Having determined the breath test administered to Pettijohn did not constitute a permissible search incident to arrest under article I, section 8, we must now turn to the question of whether the warrantless search was justified based on consent. Under article I, section 8, a warrant is not required to authorize a search based on consent. *State v. Baldon*, 829 N.W.2d 785, 791 (Iowa 2013). Rather, effective consent to a warrantless search establishes a waiver of an individual's right to be free from unreasonable searches and seizures under article I, section 8. *Id.*

1. *The statutorily implied consent to submit to chemical testing.* Before considering whether Pettijohn's affirmative consent to submit to the breath test effectively waived his right to be free from a warrantless search under article I, section 8, we first consider whether the consent

---

[7]The State does not argue exigent circumstances justifying the administration of a warrantless breath test existed in this case, nor have we identified anything about the circumstances preceding the breath test other than the natural dissipation of the alcohol in Pettijohn's blood that would support such a conclusion.

implied under the Iowa Code constituted effective consent justifying the administration of the warrantless breath test. Section 462A.14A(1) of the Code states,

> A person who operates a motorboat or sailboat on the navigable waters in this state under circumstances which give reasonable grounds to believe that the person has been operating a motorboat or sailboat in violation of section 462A.14 is deemed to have given consent to the withdrawal of specimens of the person's blood, breath, or urine and to a chemical test or tests of the specimens for the purpose of determining the alcohol concentration or presence of controlled substances or other drugs, subject to this section.

Iowa Code § 462A.14A(1). If the implied consent to warrantless searches declared in section 462A.14A constitutes an effective waiver of the right to be free from warrantless searches guaranteed by article I, section 8, then the search Pettijohn was subjected to did not violate the Iowa Constitution.

We begin our analysis by assessing decisions of the United States Supreme Court addressing the impact of implied consent in the Fourth Amendment context. In assessing that caselaw, we remain mindful that decisions of the Supreme Court addressing the scope of a right guaranteed by the United States Constitution set a floor below which the scope of a right guaranteed by the Iowa Constitution may not fall, but not a ceiling above which it may not rise. *See State v. Sweet*, 879 N.W.2d 811, 832 (Iowa 2016).

In *Birchfield*, after determining warrantless blood tests on motorists arrested for drunk driving are not justified as searches incident to arrest, the Court considered whether such tests are justified such that they do not violate the Fourth Amendment by virtue of drivers' legally implied consent to submit to them. 579 U.S. at ___, 136 S. Ct. at 2185–86. The Court ultimately concluded "motorists cannot be deemed to

have consented to submit to a blood test on pain of committing a criminal offense," reasoning there must be some "limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads." *Id.* In reaching this conclusion, the Court applied a standard of general reasonableness. *Id.* But in doing so, the Court noted this general reasonableness standard did not differ in substance from concluding motorists may be deemed to have consented only to conditions that have a nexus to the privilege of driving and entail proportionally severe penalties. *Id.* at ___, 136 S. Ct. at 2186.

Because the Court had held breath tests may be administered to motorists arrested on suspicion of drunk driving as searches incident to arrest, the *Birchfield* opinion did not address whether statutorily implied consent may justify warrantless breath tests consistent with the Fourth Amendment. *See id.* Nor did the opinion address whether motorists may be deemed to have consented to blood or breath tests when state law provides refusal to submit will subject them to civil penalties, as the petitioners had each been threatened with criminal penalties for refusal. *See id.* at ___, ___, 136 S. Ct. at 2170–72, 2185–86. However, the Court explicitly cautioned the opinion should not be read to suggest implied-consent laws imposing civil penalties and evidentiary consequences on motorists who refuse to submit are unconstitutional. *Id.* at ___, 136 S. Ct. at 2185.

Unlike *Birchfield*, *McNeely* did not directly address whether statutorily implied consent to submit to warrantless blood or breath tests constitutes consent for purposes of the Fourth Amendment. Nevertheless, we conclude the clear implication of the *McNeely* decision is that statutorily implied consent to submit to a warrantless blood test

under threat of civil penalties for refusal to submit does not constitute consent for purposes of the Fourth Amendment.

The relevant facts of *McNeely* are as follows. After the defendant refused to provide a breath sample, an officer requested an arrestee to provide a blood sample and advised him that refusal to submit to the test would subject him to civil penalties for refusal, including the immediate revocation of his license, and the possibility that his refusal would be relied upon as evidence in a future prosecution under state law. *McNeely*, 569 U.S. at 146, 133 S. Ct. at 1557. By state statute, any person who operated a motor vehicle on public highways within the state was deemed to have given consent to a chemical test subject to civil penalties for refusal. *Id.* (citing Mo. Rev. Stat. §§ 577.020, .041 (2011)). When the defendant refused to provide a blood sample despite the existence of this statutorily implied consent, the arresting officer ordered the withdrawal of his blood without applying for a warrant because he believed obtaining one "was not legally necessary." *Id.* at 163, ___, 133 S. Ct. at 1557, 1567.

The *McNeely* opinion framed the question before the Court as "whether the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations." *Id.* at 147, 133 S. Ct. at 1558. The Court held the natural dissipation of alcohol does not create a per se exigency, and that exigency in the drunk-driving context "must be determined case by case based on the totality of the circumstances." *Id.* at 156, 133 S. Ct. at 1563. Though the opinion explicitly acknowledged the existence of other exceptions to the warrant requirement, it did not consider whether any exception other than exigency might serve as a potential justification

for administering warrantless BAC tests on drunk-driving suspects under the Fourth Amendment. *See Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2174 (discussing *McNeely*). Thus, the opinion never explicitly addressed whether statutorily implied consent constitutes effective consent for purposes of determining whether a warrant was required to authorize a search under the Fourth Amendment. *See id.*

Nevertheless, *McNeely* clearly did not treat the statutorily implied consent in the Missouri statute as consent under the Fourth Amendment. Notably, in a section of the *McNeely* opinion joined by five justices, the Court framed the issue to be decided as one concerning the constitutionality of "*nonconsensual* blood testing in drunk-driving investigations." *McNeely*, 569 U.S. at 147, 133 S. Ct. at 1558 (emphasis added). Furthermore, another passage contemplating the nature of implied-consent laws explicitly referenced the ability of motorists to withdraw consent that is statutorily implied:

> States have a broad range of legal tools to enforce their drunk-driving laws and to secure BAC evidence without undertaking warrantless nonconsensual blood draws. For example, all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense. Such laws impose significant consequences when a motorist withdraws consent; typically the motorist's driver's license is immediately suspended or revoked, and most States allow the motorist's refusal to take a BAC test to be used as evidence against him in a subsequent criminal prosecution.

*Id.* at 161, 133 S. Ct. at 1566 (plurality opinion) (citation omitted).[8]

---

[8]Though only four justices joined the section of the opinion containing this passage, no opinion by any justice suggested statutorily implied consent falls within the scope of the consent exception to the warrant requirement. *See McNeely*, 569 U.S. at 165–66, 133 S. Ct. at 1568–69 (Kennedy, J., concurring in part); *id.* at 166–76, 133

Following *McNeely,* a number of state courts concluded the mere existence of statutorily implied consent does not permit the administration of a warrantless test of an individual's blood, breath, or urine consistent with the Fourth Amendment. *See, e.g., State v. Butler,* 302 P.3d 609, 613 (Ariz. 2013) (en banc); *People v. Harris,* 184 Cal. Rptr. 3d 198, 207, 213 (Ct. App. 2015); *Williams v. State,* 771 S.E.2d 373, 376–77 (Ga. 2015); *State v. Halseth,* 339 P.3d 368, 371 (Idaho 2014); *State v. Declerck,* 317 P.3d 794, 804 (Kan. Ct. App. 2014); *State v. Brooks,* 838 N.W.2d 563, 573 (Minn. 2013), *cert. denied,* ___ U.S. ___, 134 S. Ct. 1799 (2014); *State v. Modlin,* 867 N.W.2d 609, 619 (Neb. 2015); *Byars v. State,* 336 P.3d 939, 945–46 (Nev. 2014); *State v. Smith,* 849 N.W.2d 599, 605 (N.D. 2014), *abrogated by Birchfield,* 579 U.S. at ___, 136 S. Ct. at 2186; *State v. Fierro,* 853 N.W.2d 235, 243 (S.D. 2014); *State v. Wells,* No. M2013-01145-CCA-R9-CD, 2014 WL 4977356, at *13 (Tenn. Crim. App. Oct. 6, 2014); *Weems v. State,* 434 S.W.3d 655, 665 (Tex. Ct. App. 2014), *aff'd,* 493 S.W.3d 574 (Tex. Crim. App. 2016); *State v. Padley,* 849 N.W.2d 867, 879–80 (Wis. Ct. App. 2014).

A recurrent theme among state court decisions issued in *McNeely*'s wake concerned the nature of consent sufficient to justify a warrantless search consistent with the Fourth Amendment. *See, e.g., Halseth,* 339 P.3d at 371; *Byars,* 336 P.3d at 945; *Padley,* 849 N.W.2d at 879–80. Of course, it is well-settled law that consent must be voluntarily given to justify a warrantless search that comports with the Fourth Amendment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 93 S. Ct. 2041, 2059 (1973). Additionally, effective consent to a warrantless search may be

---

S. Ct. at 1569–74 (Roberts, C.J., concurring in part and dissenting in part); *id.* at 176–83, 133 S. Ct. at 1574–78 (Thomas, J., dissenting).

limited, qualified, or withdrawn. *Florida v. Jimeno*, 500 U.S. 248, 252, 111 S. Ct. 1801, 1804 (1991) ("A suspect may of course delimit as he chooses the scope of the search to which he consents."); *United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005) ("Once given, consent to search may be withdrawn . . . ."); *State v. McConnelee*, 690 N.W.2d 27, 30 (Iowa 2004) (acknowledging "consent to a search may be limited or qualified" and "authorities . . . are constrained by such limitations or qualifications"); *State v. Stanford*, 474 N.W.2d 573, 575 (Iowa 1991) ("In consent to search cases, an initial voluntary grant of consent may be limited, withdrawn or revoked at any time prior to the completion of the search."). From these general observations about the nature of effective consent sufficient to justify a warrantless search, it follows that statutorily implied consent cannot function as an automatic exception to the warrant requirement. Consent is not voluntary and capable of justifying a warrantless search unless the individual consenting has the ability to withdraw it. *See, e.g.*, *Halseth*, 339 P.3d at 371 ("Inherent in the requirement that consent be voluntary is the right of the person to withdraw that consent."); *Byars*, 336 P.3d at 945 ("A necessary element of consent is the ability to limit or revoke it.").

The implied-consent procedure set forth in chapter 462A of the Iowa Code clearly anticipates that consent implied under the statute will ordinarily be subsequently withdrawn or reaffirmed. Under section 462A.14A(1), an individual is deemed to have consented to chemical testing when he or she "operates a motorboat or sailboat on the navigable waters in this state under circumstances which give reasonable grounds to believe that the person has been operating a motorboat or sailboat in violation of section 462A.14." Iowa Code § 462A.14A(1). However, even after implied consent has attached to an

individual suspected of boating while intoxicated, the statute does not compel his or her submission to a chemical test.[9] *See id.* § 462A.14C. Rather, it requires an officer to request the individual to submit to a chemical test and advise him or her of the consequences the law attaches to the choice of submission as well as the choice of refusal. *Id.* § 462A.14C(1)(*a*)–(*b*). The individual may then choose between affirming or withdrawing his or her consent to submit to a chemical test. *See id.*

We conclude the consent implied by the statutory scheme set forth in chapter 462A of the Code does not automatically permit a warrantless search consistent with article I, section 8.[10] Accordingly, to determine whether the warrantless breath test in this case was permissible by virtue of consent, we must determine, under the totality of the circumstances, whether Pettijohn effectively consented to submit to the breath test after Officer Drish read him the implied-consent advisory. *See, e.g., Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2186 (remanding for a determination as to the voluntariness of a petitioner's consent based on the totality of the circumstances); *Williams*, 771 S.E.2d at 377

---

[9]Section 462A.14A(4)(*f*) provides, "A person who is dead, unconscious, or otherwise in a condition rendering the person incapable of consent or refusal is deemed not to have withdrawn the consent provided by this section." The State does not claim Pettijohn was dead, unconscious, or otherwise in a condition that rendered him incapable of consent or refusal. Therefore, we address this provision only insofar as to note that the exigent-circumstances exception to the warrant requirement may permit a warrantless search under such circumstances even if the consent implied under the statute does not justify a warrantless search.

[10]The State concedes implied consent is not effective consent. However, the State also relies on prior statements by this court suggesting an individual has no constitutional right to refuse a warrantless breath test under the United States Constitution when statutorily implied consent applies. *See State v. Massengale*, 745 N.W.2d 499, 501 (Iowa 2008); *State v. Knous*, 313 N.W.2d 510, 512 (Iowa 1981). We express no opinion on the continued vitality of our prior statements concerning an individual's right to refuse a breath test with respect to the United States Constitution. We simply hold the mere existence of statutorily implied consent does not justify a warrantless search under article I, section 8.

(remanding with instructions to consider the voluntariness of the defendant's consent under the totality of the circumstances).

2. *The affirmative consent to submit to the breath test.* As we have previously noted, the United States Supreme Court has determined the standard for determining the validity of consent under the Fourth Amendment is "whether the consent was voluntarily given and not a result of duress or coercion, expressed or implied." *State v. Pals*, 805 N.W.2d 767, 777 (Iowa 2011). Under this standard, the question of whether consent was voluntarily given is a question of fact to be determined by considering the totality of the circumstances. *Id.*

Under the federal standard for determining whether a warrantless search was justified based on consent, effective consent does not require a waiver of the right to be free from unreasonable searches and seizures meeting the standard that ordinarily applies to the waiver of other constitutional rights as set forth in *Johnson v. Zerbst*, 304 U.S. 458, 58 S. Ct. 1019 (1938). *See Schneckloth*, 412 U.S. at 235–46, 93 S. Ct. at 2051–58; *Pals*, 805 N.W.2d at 777. Whereas an effective waiver of a constitutional right ordinarily requires "an intentional relinquishment or abandonment of a known right or privilege" under *Zerbst*, 304 U.S. at 464, 58 S. Ct. at 1023, consent to a warrantless search that "was in fact voluntarily given, and not the result of duress or coercion, express or implied" is sufficient to forfeit the Fourth Amendment right to be free from unreasonable searches. *Schneckloth*, 412 U.S. at 248, 93 S. Ct. at 2059. In *Pals*, we acknowledged the supreme courts in several states have rejected the federal standard for determining the validity of consent under their state search-and-seizure constitutional provisions. 805 N.W.2d at 779. In a number of these states, consent to a warrantless search is valid only if an individual knowingly and intelligently waived

his or her rights under the search-and-seizure provision of the state constitution. *Id.* at 779, 782.

The Supreme Court has never reversed a conviction for operating while intoxicated based on the involuntariness of an individual's consent to submit to a BAC test. However, its decisions in two prior cases have significant implications with respect to the requirements of voluntary consent in the implied-consent context.

First, in *South Dakota v. Neville*, the Court held the privilege against self-incrimination does not protect an individual's "refusal to take a blood-alcohol test, after a police officer has lawfully requested it" because refusal under such circumstances does not constitute "an act coerced by the officer." 459 U.S. 553, 564, 103 S. Ct. 916, 924 (1983). The Court rested its decision on the ground that "no impermissible coercion is involved when the suspect refuses to submit to take the test." *Id.* at 562, 103 S. Ct. at 921–22. Nonetheless, though the statute only provided for civil penalties upon the act of refusal to submit and required officers to inform suspects of their right to refuse BAC testing, the Court acknowledged such statutes unquestionably force defendants to make difficult choices:

> We recognize, of course, that the choice to submit or refuse to take a blood-alcohol test will not be an easy or pleasant one for a suspect to make. But the criminal process often requires suspects and defendants to make difficult choices.

*Id.* at 564, 103 S. Ct. at 922–23.

Second, in *Birchfield*, the Court reversed the conviction of a petitioner who submitted to a blood test after being advised "that refusing to consent would itself be a crime." 579 U.S. at ___, ___, 136 S. Ct. at 2172, 2185–86. But the Court remanded the case to the state

court for a reevaluation of the voluntariness of the petitioner's consent in light of "the partial inaccuracy of the officer's advisory," noting the state supreme court had held his consent was voluntary "on the erroneous assumption that the State could permissibly compel both blood and breath tests." *Id.* at ___, 136 S. Ct. at 2186. The Court indicated remand was necessary because voluntariness must be determined "from the totality of all the circumstances." *Id.* (quoting *Schneckloth,* 412 U.S. at 227, 93 S. Ct. at 2047–48).

Relying on federal caselaw, in *State v. Knous*, we indicated that determining the voluntariness of an individual's consent to a BAC test given after an officer invokes implied-consent procedures "requires an examination of the totality of the circumstances to determine whether the decision was voluntary or coerced." 313 N.W.2d 510, 512 (Iowa 1981).[11] Nevertheless, in doing so we assumed individuals who asked to submit to BAC tests have only a "statutory right to withdraw consent which is deemed to exist by statutory implication," rather than a constitutional right to refuse guaranteed by article I, section 8 of the Iowa Constitution. *See id.* On this assumption, we concluded proving an individual had knowledge of the right to refuse a BAC test "is not a prerequisite" to establishing his or her consent to submit to such a test was voluntary and effective. *See id.*[12] However, we also determined knowledge of the

---

[11]The implied-consent statute that applies to individuals suspected of operating a motor vehicle while intoxicated is substantially similar to the statute that applies to individuals suspected of boating while intoxicated. *Compare* Iowa Code §§ 462A.14, .14A, .14B, *with id.* §§ 321J.6, .8, .9. Therefore, we draw on our relevant context from cases involving the operation of a motor vehicle while intoxicated in describing the requirements of voluntary consent in cases involving individuals suspected of boating while intoxicated.

[12]This is consistent with the federal standard for determining the effectiveness of consent to a warrantless search as expressed in *Schneckloth,* 412 U.S. at 248–49, 93 S. Ct. at 2059.

right to refuse a BAC test nevertheless constitutes a "relevant circumstance" in determining whether consent to submit to one was voluntary. *Id.*

Our prior caselaw also acknowledges that when an officer invokes implied-consent procedures and requests an individual to submit to a BAC test, voluntary consent requires some degree of knowledge. For example, we have determined consent to submit to a chemical test is not voluntary unless it is "freely made, uncoerced, reasoned, and informed." *State v. Garcia*, 756 N.W.2d 216, 220 (Iowa 2008). Similarly, we have indicated the "ultimate question" in determining the voluntariness of consent in the implied-consent context is whether the decision to comply with an officer's request to submit to the test was "a reasoned and informed decision." *State v. Overbay*, 810 N.W.2d 871, 876 (Iowa 2012) (quoting *State v. Bernhard*, 657 N.W.2d 469, 473 (Iowa 2003)). Thus, our cases recognize an individual's consent to submit to a BAC test is involuntary and invalid if the consent was coerced or the individual was not reasonably informed of the consequences of failing or refusing the test at the time consent was given. *Garcia*, 756 N.W.2d at 220; *see Overbay*, 810 N.W.2d at 880.

Notably, our caselaw that establishes an individual must have knowledge concerning the consequences of failing or refusing a BAC test to voluntarily consent to one have neither invoked the Iowa Constitution in arriving at this conclusion nor addressed the general requirements of effective consent under article I, section 8. *See Overbay*, 810 N.W.2d at 875–80; *Garcia*, 758 N.W.2d at 219–23; *Bernhard*, 657 N.W.2d at 471–73; *see also State v. Hutton*, 796 N.W.2d 898, 906–07 (Iowa 2011); *State v. Gravenish*, 511 N.W.2d 379, 381–82 (Iowa 1994). Rather than consider whether effective consent requires a knowing and intelligent

waiver of the right to be free from warrantless searches in article I, section 8 under the Iowa Constitution, we have instead emphasized that understanding the consequences of refusing or failing a chemical test when deciding to submit to one is relevant to determining whether that consent was voluntary. *See Overbay,* 810 N.W.2d at 880; *Garcia,* 758 N.W.2d at 220, 223; *Berhnard,* 657 N.W.2d at 472–73; *see also Hutton,* 796 N.W.2d at 906–07; *Gravenish,* 511 N.W.2d at 381–82. Moreover, we have distinguished between knowledge of the statutory consequences of failing or refusing a BAC test and knowledge that submitting to a request for a BAC test involves the relinquishment of the constitutional right to be free from unreasonable searches. *See Knous,* 313 N.W.2d at 512 (distinguishing between the knowledge of the statutory consequences and the relinquishment of a constitutional right).

We have yet to consider whether a knowing and intelligent waiver of the right to be free from warrantless searches and seizures set forth in article I, section 8 is required to establish the effectiveness of consent under the Iowa Constitution. *See Baldon,* 829 N.W.2d at 822; *see also Pals,* 805 N.W.2d at 782. Pettijohn argues effective consent to a warrantless breath test requires a knowing and intelligent waiver of the rights set forth in article I, section 8 of the Iowa Constitution. However, we begin our analysis of the effectiveness of Pettijohn's consent to submit to the warrantless breath test by considering whether it met the federal standard for effective consent, as the State concedes his consent was not effective under article I, section 8 unless it was "voluntarily given and not a result of duress or coercion, expressed or implied." *Pals,* 805 N.W.2d at 777.

"The question of voluntariness requires the consideration of many factors, although no factor itself may be determinative." *State v. Lane,*

726 N.W.2d 371, 378 (Iowa 2007). In assessing whether a defendant's consent to a warrantless search was voluntary, factors to be considered include, but are not limited to,

> personal characteristics of the defendant, such as age, education, intelligence, sobriety, and experience with the law; and features of the context in which the consent was given, such as the length of detention or questioning, the substance of any discussion between the defendant and police preceding the consent, whether the defendant was free to leave or was subject to restraint, and whether the defendant's contemporaneous reaction to the search was consistent with consent.

*United States v. Jones*, 254 F.3d 692, 696 (8th Cir. 2001); *see Pals*, 805 N.W.2d at 786; *Lane*, 726 N.W.2d at 378. "This test balances the competing interests of legitimate and effective police practices against our society's deep fundamental belief that the criminal law cannot be used unfairly." *State v. Lowe*, 812 N.W.2d 554, 572 (Iowa 2012); *accord State v. Reinier*, 628 N.W.2d 460, 465 (Iowa 2001).

As a starting point in our analysis of the totality of the circumstances to determine whether Pettijohn's consent was voluntary and uncoerced, we note the State does not dispute that Pettijohn was legally intoxicated when he submitted to the warrantless breath test. Although by no means dispositive in our analysis of the totality of the circumstances, evidence that an individual was under the influence of drugs or alcohol is a factor we consider in evaluating the voluntariness of an individual's consent to a warrantless search. *See, e.g., State v. Prusha*, 874 N.W.2d 627, 631 (Iowa 2016); *Lowe*, 812 N.W.2d at 573–74; *Lane*, 726 N.W.2d at 378; *Gravenish*, 511 N.W.2d at 381. Because it is undisputed Pettijohn was intoxicated when he submitted to the breath test, this factor weighs against finding his consent voluntary and uncoerced.

Similarly, the State does not dispute that officers arrested Pettijohn and transported him to the police station before he submitted to the breath test. Though the fact an individual was seized when he or she consented to a warrantless search is not necessarily determinative under the totality-of-the-circumstances test, the potential for coercion exists even in seemingly innocuous circumstances involving seizures. *See Baldon*, 829 N.W.2d at 797–98; *Pals*, 805 N.W.2d at 782–83. "In other words, coercion can easily find its way into human interaction when detention is involved." *Baldon*, 829 N.W.2d at 798. For this reason, our recent caselaw acknowledges that brief seizures such as traffic stops constitute an "inherently coercive" setting. *Pals*, 805 N.W.2d at 783; *see also Baldon*, 829 N.W.2d at 798; *Lowe*, 812 N.W.2d at 575 n.11. Such a setting is inherently coercive because it is one in which "police plainly have the upper hand and are exerting authority in a fashion that makes it likely that a citizen would not feel free to decline to give consent for a search." *Pals*, 805 N.W.2d at 783.

As compared to an ordinary roadside detention, arrest involves an even greater degree of inherent coercion. Simply put, "the psychological impact of an arrest immediately preceding a consent to search may not be ignored" in determining whether consent to a warrantless search was voluntary under the totality of the circumstances. *Ahern*, 227 N.W.2d at 166. Consequently, the fact officers arrested Pettijohn and transported him to the police station before he submitted to the breath test cuts sharply against finding his consent was voluntary and uncoerced.

Next, we note the implied-consent advisory read to Pettijohn did not advise him of his constitutional right to refuse a warrantless search. Whether an individual had knowledge of his or her constitutional right to withhold consent is not a prerequisite to finding that consent was

voluntary, but it is one factor we consider in determining whether consent to submit to a warrantless search was voluntary. *Pals*, 805 N.W.2d at 783; *see Schneckloth*, 412 U.S. at 227, 93 S. Ct. at 2048. Conversely, a warning that consenting to a warrantless search involves the relinquishment of a constitutional right to be free from warrantless searches may significantly neutralize the coercive context in which a request for consent is made. *Pals*, 805 N.W.2d at 783. In the inherently coercive context of custodial detention, the fact an individual was not informed that consenting to a warrantless search amounts to giving up the constitutional right to withhold consent amounts to a "strong factor cutting against the voluntariness" of his or her consent to an ensuing search. *Id.* In the implied-consent context, properly weighing this factor in analysis of the totality of the circumstances requires us to distinguish between knowledge of the penalties attached to the choice of refusal and knowledge that submitting to a request for a BAC test involves the relinquishment of the constitutional right to be free from warrantless searches. *See Knous*, 313 N.W.2d at 512.

The State does not dispute that the implied-consent advisory Officer Drish read to Pettijohn did not advise him that consenting to the warrantless breath test would involve the relinquishment of a constitutional right. Nor does the State dispute that the advisory did not advise Pettijohn that he had a constitutional right to withhold his consent. Accordingly, this factor also cuts against finding Pettijohn's consent to the breath test was voluntary and uncoerced, particularly in light of the fact that he was arrested before he submitted to the breath test.

Relatedly, we note the implied-consent advisory administered to Pettijohn suggested he had *no* affirmative right to refuse to consent.

After all, the advisory unequivocally stated that refusal to consent to a request to submit to a chemical test was "punishable" by a mandatory fine and the suspension of his operating privileges. And the form on which the advisory was printed indicated no test was "required" only in the event that no test was offered within two hours of a preliminary screening test or an arrest. We therefore conclude the advisory was misleading because it implied Pettijohn had no constitutional right to refuse to consent, a factor we weigh strongly against finding his consent was voluntary and uncoerced.

Knowledge that criminal penalties will attach to the refusal to consent to a warrantless search the State cannot properly compel constitutes a determinative factor to be weighed in assessing the voluntariness of the consent to a search. *See Birchfield*, 579 U.S. at ___, ___, 136 S. Ct. at 2172, 2185–86. However, the mere fact an individual faces only the prospect of civil rather than criminal penalties for refusing to consent does not render those penalties irrelevant to determining the voluntariness of his or her consent to a warrantless search. On the contrary, that an individual consented to a search knowing civil penalties would attach if he or she refused to consent is one factor to be weighed in assessing the voluntariness of his or her consent, particularly when those civil penalties are potentially as severe as some criminal penalties.

The advisory Pettijohn received informed him that refusal to submit was "punishable by a mandatory civil penalty of five hundred to two thousand dollars, and suspension of motorboat or sailboat operating privileges for at least a year." Iowa Code §§ 462A.14A(4)(*g*)(1), .14C(1)(*a*). We note the minimum mandatory civil fine for refusal to submit is greater than the minimum fines associated with convictions for both

simple and serious misdemeanor criminal offenses.[13]  Furthermore, the maximum mandatory civil fine for refusal to submit is greater than the maximum fines associated with convictions for both simple and serious misdemeanors as well as the minimum fine associated with a conviction for an aggravated misdemeanor.[14]  Thus, the advisory not only informed Pettijohn his refusal to submit would subject him to mandatory fines as punishment, but also reflected those fines would be just as hefty as the fines he would have received had the implied-consent statute deemed refusal to be a criminal misdemeanor offense.  This fact cuts against finding his consent to the warrantless search was voluntary and uncoerced, as the State could not compel him to submit to the warrantless breath test under article I, section 8.  *See Birchfield*, 579 U.S. at ___, ___, 136 S. Ct. at 2172, 2185–86.

The advisory Pettijohn received was also misleading in that it indicated his refusal to submit to the request for a breath test could

---

[13]*Compare* Iowa Code § 462A.14B(2)(*b*)(1) (providing the court shall impose a mandatory civil penalty of five hundred dollars upon finding a person refused to consent to chemical testing when the conditions specified in section 462A.14A existed for the first time), *with id.* § 903.1(1)(*a*) (providing that upon convicting a person of a simple misdemeanor, the court shall impose "a fine of at least sixty-five dollars"), *and id.* § 903.1(1)(*b*) (providing that upon convicting a person of a serious misdemeanor, the court shall impose "a fine of at least three hundred fifteen dollars").

[14]*Compare* Iowa Code § 462A.14B(2)(*b*)(3) (providing the court shall impose a mandatory civil penalty of two thousand dollars upon finding a person refused to consent to chemical testing when the conditions specified in section 462A.14A existed for the third or subsequent time), *with id.* § 903.1(1)(*a*) (providing that upon conviction for a simple misdemeanor, the court shall impose "a fine . . . not to exceed six hundred twenty-five dollars"), *id.* § 903.1(1)(*b*) (stating that upon conviction for a serious misdemeanor, the court shall impose "a fine . . . not to exceed one thousand eight hundred seventy-five dollars"), *and id.* § 903.1(2) (providing that upon conviction for an aggravated misdemeanor, "[t]here shall be a fine of at least six hundred twenty-five dollars").  Notably, the maximum civil fine associated with refusal to submit also exceeds the fine the court must assess upon an individual's first conviction for the serious misdemeanor offense of operating while intoxicated.  *Compare id.* § 462A.14B(2)(*b*)(3), *with id.* § 462A.14(2)(*a*)(2).

result in the suspension of his boating privileges for just as long as a conviction for operating while intoxicated might.[15]  By statute, refusal to submit is punishable by a mandatory suspension of boating privileges for precisely one year, *see* Iowa Code § 462A.14B(2)(*a*), whereas a conviction for operating while intoxicated results in a suspension of boating privileges for one to six years, *see id.* § 462A.14(2)(*a*)(3), (2)(*b*)(3), (2)(*c*)(3). As we previously acknowledged in the course of analyzing a substantive due process claim in this context, when an individual submits to a warrantless BAC test after an implied-consent advisory overstates the penalty associated with refusal to consent, we cannot necessarily be confident the individual's decision to consent was unaffected by the inaccuracy in the advisory.  *State v. Massengale*, 745 N.W.2d 499, 504 (Iowa 2008).  Thus, we must also weigh this misleading aspect of the advisory in assessing the totality of the circumstances to determine whether the consent Pettijohn gave was voluntary and uncoerced.

We recognize that unlike the loss of the ability to drive upon public roads, the loss of the ability to boat on state waterways ordinarily does not implicate the fundamental right to earn a living.  *See Gilchrist v. Bierring*, 234 Iowa 899, 914, 14 N.W.2d 724, 732 (1944) (describing the right to earn a living as being among the "fundamental, constitutional rights of the citizen" and "the greatest of human rights").  Unlike driving, however, boating implicates the "paramount" right of Iowans to use state

---

[15]*Compare* Iowa Code §§ 462A.14A(4)(*g*)(1), .14C(1)(*a*) (requiring an officer to advise an individual requested to consent to a chemical test that "refusal to submit to the test is punishable by . . . suspension of motorboat or sailboat operating privileges for at least a year"), *with id.* §§ 462A.14A(4)(*g*)(2), .14C(1)(*b*) (requiring an officer to advise an individual requested to consent to a chemical test that if the person submits to the test and the results indicate his or her BAC exceeds the level prohibited by section 462A.14, his or her boating privileges will be suspended "for at least one year" and "up to six years").

waterways for navigational and recreational purposes. *See Witke v. State Conservation Comm'n*, 244 Iowa 261, 267, 56 N.W.2d 582, 586 (1953) (quoting *McCauley v. Salmon*, 234 Iowa 1020, 1022, 14 N.W.2d 715, 716 (1944)). This right derives from the very act of Congress that granted Iowa statehood, in which Congress declared the Mississippi River "and the navigable waters leading into the same, shall be common highways, and forever free as well to the inhabitants of said State, as to all other citizens of the United States." *State v. Sorensen*, 436 N.W.2d 358, 361 (Iowa 1989) (quoting section 3 of An Act for the Admission of the States of Iowa and Florida into the Union, Mar. 3, 1845, *reprinted in* Iowa Code volume VI at p. 1534 (2013)). Thus, it reflects the foundational principle of the public trust doctrine embraced by the English common law and nineteenth century jurists—"the notion that the public possesses inviolable rights to certain natural resources." *Id.* Given that this notion played a central role in the founding of this State and to ensure the associated right to access state waterways maintains its vitality in modern times, we decline to treat its threatened loss as a matter of little consequence.[16] Thus, we conclude the fact that Pettijohn faced the loss

---

[16]We note Pettijohn argues that because operating a boat does not constitute an affirmatively granted privilege requiring a license, the implied-consent statute set forth in chapter 462A of the Code is unconstitutional. His argument rests on the assumption we repudiate today—that the implied-consent statute operates as a legislatively implied contract whereby an individual waives his right to be free from unreasonable searches in exchange for a privilege. *See State v. Jensen*, 216 N.W.2d 369, 373 (Iowa 1974). Though this alone constitutes a sufficient basis for rejecting this argument, we reject it on additional grounds as well.

First, under the Iowa Code, implied consent is deemed to exist whenever any person operates a motor vehicle or boat within the state under specified conditions. *See* Iowa Code § 321J.6(1); *id.* § 462A.14A(1). Thus, in determining whether implied consent existed under the implied-consent statutes such that invocation of the procedures set forth therein was appropriate, licensure is beside the point. *Cf. State v. Kjos*, 524 N.W.2d 195, 197 (Iowa 1994) (reversing a conviction for driving while intoxicated because an officer was statutorily precluded from telling the defendant his license would be automatically revoked if he did not consent to testing). Second, it is

of his right to boat on state waterways does weigh against finding his consent was voluntary and uncoerced, though we acknowledge the loss of this right would weigh more strongly against a finding of voluntariness if it had implicated his ability to earn a living.

Finally, with respect to the consequences of submitting to the breath test, the advisory indicated only that Pettijohn would face the loss of his boating privileges "for at least one year and up to six years" if he submitted to the breath test and the results led to his conviction under section 462A.14. Though the advisory accurately indicated the civil penalty associated with a conviction for operating while intoxicated, we note it failed to mention that a conviction for operating while intoxicated would result in the imposition of significant criminal penalties. *See* Iowa Code § 462A.14(2). Namely, a conviction for operating while intoxicated results in mandatory imprisonment for forty-eight hours to one year and a mandatory fine of one thousand to seven thousand five hundred dollars. *See id.* § 462A.14(2). The fact that the advisory stated the civil consequences associated with convictions for operating while intoxicated and failed to mention the serious criminal consequences rendered it significantly inaccurate and misleading. This factor weighs substantially

---

beyond dispute that regulations addressing the operation of boats on state waterways may be enacted by the legislature in proper exercise of the State's police powers. *See, e.g.*, *State v. Jackman*, 211 N.W.2d 480, 484 (Wis. 1973); *Ex parte Powell*, 70 So. 392, 397 (Fla. 1915). The legislature has enacted many limits on the operation of boats implicating public safety. *See* Iowa Code § 462A.12. For example, though licensure is not required to operate a boat on state waterways, boats may generally be operated only by persons who are at least eighteen years of age, except under limited circumstances. *Id.* § 462A.12(6). The existence of these regulations make clear that just as there is no absolute right to operate a motor vehicle on state highways "under any and all conditions," *State v. Holt*, 261 Iowa 1089, 1094, 156 N.W.2d 884, 887 (1968), there is no absolute right to operate a boat on state waterways.

against concluding the consent Pettijohn gave was voluntary and uncoerced under the totality of the circumstances.

We acknowledge the fact an individual was forced to choose between two unpalatable alternatives does not necessarily defeat the voluntariness of his or her consent to a warrantless search. *Baldon*, 829 N.W.2d at 801; *see Neville*, 459 U.S. at 559–60, 563, 103 S. Ct. at 920–21, 922. But we remain mindful that an individual put to such a choice may have essentially "no choice at all" such that coercion may arise. *Baldon*, 829 N.W.2d at 801 (quoting *Tamez v. State*, 534 S.W.2d 686, 692 (Tex. Crim. App. 1976)). When an individual agrees to submit to a warrantless search upon request in order to avoid the imposition of undesirable consequences by the government, we must carefully assess the relative bargaining power of the parties to determine whether the so-called consent resulted from a one-sided agreement. *See id.* at 801–02.

Relying on basic contract principles, we previously held a parole agreement containing a provision whereby a prisoner consents to prospective warrantless searches as a precondition to release is insufficient to establish his or her consent was voluntary in light of the relative lack of bargaining power parolees possess as compared to the government. *Id.* Arguably, an individual arrested on suspicion of drunk boating retains a greater degree of bargaining power than a parolee by virtue of the fact that he or she retains the ability to demand a trial. *See id.* at 795. Yet the significance of this distinction is diminished by the reality that any choice an individual makes when an officer invokes implied-consent procedure will undermine his or her chance of prevailing at trial. Certainly, the results of a BAC test constitute powerful evidence of intoxication culminating in an all-but-certain conviction for operating while intoxicated if an individual has a BAC of .08 or higher. *See State v.*

*Senn*, 882 N.W.2d 1, 48 (Wiggins, J., dissenting). Additionally, under section 462A.14A(8), "proof of refusal is admissible in any civil or criminal action or proceeding arising out of acts alleged to have been committed while the person was operating a motorboat or sailboat in violation of section 462A.14." Iowa Code § 462A.14A(8). Having been advised the outcome following refusal will be the imposition of mandatory civil penalties *and* additional penalties if convicted of operating while intoxicated, an intoxicated individual requested to submit to a BAC test may believe he or she has no meaningful choice to make. *See id.* §§ 462A.14A(4)(*g*)(1), .14C(1)(*a*).

Pettijohn did not face the promise of a criminal record for refusing to submit to the BAC test, and the act of refusing to submit did not require him to commit a crime in the presence of an officer. These facts weigh in favor of concluding his consent to the warrantless breath test was voluntary and uncoerced, but they are by no means determinative.

On the contrary, we think the totality of the circumstances under which Pettijohn submitted to the breath test indicates his consent to that warrantless search was not voluntary and uncoerced. The evidence is undisputed that Pettijohn was intoxicated when he submitted to the breath test such that his capacity to make reasoned and informed decisions was diminished. Before he submitted to the test, he was arrested and transported to the police station. There, he was advised of significant civil penalties that would attach to his refusal to submit or conviction for operating while intoxicated. However, he was not advised of his constitutional right to withhold consent or the serious criminal penalties that would result if he submitted to the test and failed it.

The mere fact that Pettijohn submitted to the breath test after being read the implied-consent advisory is inadequate to establish his effective consent. Because Pettijohn made the decision to submit to the breath test in the inherently coercive context of custodial detention with incomplete and inaccurate information, while intoxicated and facing the prospect of significant penalties if he refused to submit, we conclude his consent to the warrantless search was not voluntary and uncoerced. Accordingly, in light of our conclusion that the State had no right to compel the warrantless breath test as a search incident to his lawful arrest, we conclude the admission of the results of the breath test violated article I, section 8 of the Iowa Constitution.

Under the totality of the circumstances, the choice to consent to a warrantless search here was merely illusory. Therefore, under article I, section 8, we must hold Pettijohn's submission to the breath test did not constitute effective consent.

As we previously recognized,

> We are duty bound to give the liberty in article I, section 8 of our constitution the integrity it deserves and demands, and we must not allow the government to avoid an important constitutional check on its power by using an unfair play on human nature.

*Baldon*, 829 N.W.2d at 802. In this case, our duty to honor and protect the integrity of article I, section 8 requires us to hold Pettijohn's submission to a breath test after an officer invoked the implied-consent procedure set forth in chapter 462A of the Code did not constitute effective consent to a warrantless search.

**XI. Claim this Decision Makes the Statutory Scheme Governing the Operation of a Motor Vehicle While Under the Influence Unconstitutional.**

A person reading this decision should not jump to the conclusion that our analysis will make the statutory scheme governing the operation of a motor vehicle while under the influence unconstitutional. Nevertheless, we do not doubt evaluating the totality of the circumstances could lead to a different outcome in the implied-consent context in an appropriate case. For example, in the area of operating a motor vehicle while under the influence, our legislature has chosen not to make it a criminal offense or have a mandatory monetary civil penalty when an individual refuses to take the chemical test.[17]

The Hawaii Supreme Court has done this analysis in connection with its operating a motor vehicle while intoxicated statutes in *State v. Yong Shik Won*, 372 P.3d 1065 (Haw. 2015). There, the supreme court found in the context of drunk driving that an additional penalty above the normal loss of a person's license was coercive and thus, made the defendant's consent involuntary under its state constitution. *Id.* at 1083–84. However, the court recognized that it has upheld the state's implied-consent scheme without the additional penalty when a defendant is accurately informed of the right to withdraw his implied consent so that consent is free and voluntary. *Id.* at 1080. In other words, the additional penalty in Hawaii's drunk-driving laws, as the additional penalty in our boating laws, made the consent involuntary, not the mere loss of driving privileges.

---

[17]*Compare* Iowa Code § 462A.14A(4)(*g*)(1) (creating a mandatory monetary civil penalty for refusal to take the test), *with id.* § 321J.9(1)(*a*)–(*b*) (containing neither a criminal penalty nor mandatory monetary civil penalty).

Accordingly, this decision only applies to the statutory scheme for operating a boat while under the influence and not to the statutory scheme for operating a motor vehicle while under the influence. Any decision relating to operating a motor vehicle while under the influence will have to wait for another case raising its constitutionality.

## XII. Disposition.

Because the officer who stopped the boat had a reasonable, articulable suspicion that Pettijohn was committing a crime, we conclude the seizure of the boat did not violate the Fourth Amendment to the United States Constitution nor article I, section 8 of the Iowa Constitution. However, because the State failed to prove Pettijohn voluntarily consented to the warrantless breath test and failed to prove the breath test was justified by an exception to the warrant requirement, we conclude the warrantless administration of the breath test violated article I, section 8 of the Iowa Constitution. Therefore, we reverse the judgment of the district court and remand the case for a new trial.

**DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Cady, C.J., Appel and Hecht, JJ., join this opinion. Cady, C.J., files a special concurrence. Waterman, Mansfield, and Zager, JJ., dissent.

**CADY, Chief Justice (concurring specially).**

I concur in the opinion of the court. First, I agree the officer permissibly stopped Dale Dean Pettijohn Jr. after observing a violation of Iowa Code section 462A.12(1) (2013). *See State v. Vance,* 790 N.W.2d 775, 780 (Iowa 2010). Second, I agree the search of Pettijohn's breath was constitutional under the United States Supreme Court's interpretation of the search-incident-to-arrest exception to the warrant requirement of the Fourth Amendment. *See Birchfield v. North Dakota,* 579 U.S. ___, ___, 136 S. Ct. 2160, 2184 (2016). Third, I agree the search was not justified under our independent interpretation of the search-incident-to-arrest exception to the warrant requirement of Iowa Constitution article I, section 8. *See State v. Gaskins,* 866 N.W.2d 1, 16 (Iowa 2015). And, fourth, I agree Pettijohn's consent to the search was coerced by the State's threat of penalties authorized by Iowa Code section 462A.14B(2)(*b*)(1)–(3). *See State v. Baldon,* 829 N.W.2d 785, 802–03 (Iowa 2013). I write separately because I would decide this case solely on these grounds.

Consent is one of the well-recognized exceptions to the constitutional requirement that searches must be conducted pursuant to a warrant. *See id.* at 791. Consent, however, can only be used as an exception if it was voluntary. *See id.* at 792.

In this case, it is unnecessary to analyze the totality of the circumstances to determine if Pettijohn voluntarily consented to chemical testing. This analysis is unnecessary because the statutory implied-consent scheme for boating in Iowa is inherently coercive and cannot be used under the Iowa Constitution to justify a warrantless withdrawal of blood, breath, or urine based on consent.

Implied-consent laws were enacted in the context of motor vehicle operation to secure cooperation with breath tests. *See Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2168–69. "They provided that cooperation with [blood-alcohol content] testing was a condition of the privilege of driving on state roads and that the privilege would be rescinded if a suspected drunk driver refused to honor that condition." *Id.* at ___, 136 S. Ct. at 2169; *see also State v. Knous*, 313 N.W.2d 510, 512 (Iowa 1981) ("[T]he implied consent statute is based on the premise 'that a driver impliedly agrees to submit to a test in return for the privilege of using the public highways.'" (quoting *State v. Hitchens*, 294 N.W.2d 686, 687 (Iowa 1980))). In other words, implied-consent laws do not mandate consent to testing, but require the driver to make a choice when suspected of operating a motor vehicle while under the influence of alcohol or a controlled substance: either submit to testing pursuant to the implied consent previously given in exchange for the privilege of driving, or revoke it and lose the privilege. In essence, if a driver refuses testing, the entire arrangement is revoked.

In *Baldon*, we analogized the consent given in an agreement with the state to a contract with the state. 829 N.W.2d at 791. In doing so, we recognized that the decision to enter into a contract can "involve a choice between two unpalatable alternatives, which does not defeat the voluntariness of the consent." *Id.* at 801. Yet, we also recognized there may be some situations in which coercion does surface to defeat the consent. *See id.* ("[T]his proposition does not mean a choice between two unpalatable alternatives can never be coercive.").

Under the implied-consent law for boating in Iowa, if a boat operator revokes the implied consent to testing, so, too, does the state revoke the corresponding privilege to operate a boat. *See* Iowa Code

§ 462A.14B(2)(*a*). In other words, the operator is simply placed back in the position occupied before being given the privilege to operate a boat. This component of the implied-consent law for boating is not coercive in any way. Instead, the choice presented to a boat operator relates to the benefit exchange that allowed the person to operate a boat. If the person subsequently decides to withhold the implied consent given to the state, the state is, in turn, entitled to withhold the benefit bestowed. These circumstances do not present coercion, but a return of the parties to their original positions.

However, under Iowa's implied-consent law for boating, the consequences of withholding consent are not limited to the loss of the privilege to operate a boat. The law also imposes a mandatory civil penalty of at least $500 as punishment for the refusal to submit to chemical testing. *See* Iowa Code § 462A.14A(4)(*g*)(1) ("A refusal to submit to the test is *punishable* by a mandatory civil penalty of five hundred dollars to two thousand dollars . . . ." (Emphasis added.)); *see also id.* § 462A.14B(2)(*b*)(1)–(3) (requiring the court impose the applicable penalty). The threat of this punishment necessarily means the subsequent consent was obtained by coercion and was thus involuntary.

In the context of consent, the $500 penalty is coercive for two central reasons. First, the law requires an officer to tell the boat operator of the mandatory fine prior to deciding whether to give consent to chemical testing or to refuse chemical testing. *See id.* § 462A.14A(4)(*g*)(1). Thus, the person is told the fine is not only an additional consequence, but a consequence specifically conditioned on withholding consent. *See id.* § 462A.14A(4)(*g*)(1)–(2). Furthermore, the consequence involves the loss of substantial property. *See id.* § 462A.14B(2)(*b*)(1)–(3). Second, the penalty is coercive because the

court imposes it only if the operator revokes consent. *See id.* The court does not impose the penalty as a consequence of a test result in excess of the legal limit. *Cf. id.* § 462A.14(2)(*a*)–(*e*) (identifying the penalties for operating a boat while intoxicated).

Under these circumstances, the $500 civil penalty serves primarily, if not entirely, to pressure the person to consent to testing. We simply cannot ignore what the statute actually seeks to accomplish or fail to acknowledge how the penalty interferes with the voluntariness of the decision the boat operator must make when suspected of operating while intoxicated. The statute, plain and simple, is inherently coercive. Any person faced with the prospect of being required to pay $500 unless consent is given would feel the coercion.

Of course, the boating statute can be written to avoid the element of coercion. The implied-consent law for motor vehicles is an example. This law avoids the use of coercion because it only requires an officer to advise a driver that the department of transportation will revoke the driver's license to operate the motor vehicle if consent is not given and that the same will occur if consent is given and the test reveals the presence of alcohol or a controlled substance in excess of statutory limits. *Id.* § 321J.8(1)(*a*)–(*b*); *see also Voss v. Iowa Dep't of Transp.*, 621 N.W.2d 208, 212 (Iowa 2001) ("The clear intent of [these advisements] is to provide a person who has been requested to submit [to] a chemical test a basis for evaluation and decision-making in regard to either submitting or not submitting to the test."). In this way, the only consequence injected into the decision to consent or refuse is losing the benefit of the bargain that resulted in obtaining the privilege to drive. *See* Iowa Code § 321J.9(1)(*a*)–(*b*).

It is true that the law also requires the imposition of a $200 civil fine "if the department revokes a person's driver's license" pursuant to the implied-consent law. *Id.* § 321J.17(1). However, unlike the penalty imposed for refusing consent to testing while boating, this penalty is not imposed just as a punishment for refusing the test. Instead, the department of transportation imposes the fine when it is required to revoke a license for *any* reason under the statute. *See id.* For example, the department also imposes the fine when a license is revoked for testing in excess of statutory limits. *See id.* §§ 321J.12(1), .17(1). Thus, the $200 penalty under the implied-consent law for motor vehicles relates to the administrative process of revoking and reinstating a license, unlike the implied-consent law for boating. In fact, the department imposes many additional consequences of license revocation, *see generally id.* § 321J.17(1)–(3) (requiring, among other things, a driver install an ignition interlock device and attend substance abuse evaluation and treatment), but the only consequence directly relating to the refusal to consent is the revocation itself.

Thus, the legislature can rewrite the implied-consent law for boating to remove the element of coercion and maintain the implied-consent procedure. Furthermore, operating a boat while intoxicated will still be a crime in Iowa and can still be prosecuted. Actually, consented-to breath testing will be available to aid in any prosecution, and boaters can be prosecuted for operating while intoxicated without the aid of a chemical test. The only difference without the power of implied consent is that the refusal to consent to chemical testing will not result in the loss of boating privileges or the imposition of a penalty, at least until the law is changed so that it is comparable to the implied-consent law for motor vehicles.

In *Baldon,* a "fundamental[]" reason we held parolee consent searches pursuant to a parole agreement invalid was because the searches were "conceptually detached from the concept of bargaining." 829 N.W.2d at 802. The monetary penalty here is similarly unrelated to the privilege sought to be obtained. It is coercive, and thus it is the State's burden to present additional evidence in the record to reveal Pettijohn voluntarily consented to the search. *See id.* The only evidence in this case is that Pettijohn read and understood the implied-consent warning required by statute. As discussed above, that statute was coercive and therefore could not establish his consent.

In a court system, judges are required to call a strike a strike and a ball a ball. The implied-consent law for boating was written to coerce consent to chemical testing. There is no way around calling this strike a strike. While some will see the decision as creating controversy, it actually identifies the value of a fair and impartial court system and upholds the integrity of the process of justice. Perhaps even more important, the decision upholds the constitutional values Iowans prize. For these reasons, I concur in the opinion of the court.

**WATERMAN**, **Justice (dissenting).**

I respectfully dissent and would affirm Dale Dean Pettijohn Jr.'s conviction for drunken boating. The majority correctly holds that Officer William Wineland lawfully stopped the boat Pettijohn was operating on Saylorville Lake and that Pettijohn's warrantless breath test to measure his blood alcohol level satisfied the Fourth Amendment. The majority also correctly rejects Pettijohn's theory that his "natural right" to use Iowa waterways limits the State's power to criminalize drunken boating as it criminalizes drunken driving on Iowa roads. But I part company with the majority's unprecedented conclusion that Pettijohn's breath-test results must be suppressed under article I, section 8 of the Iowa Constitution. In my view, that breath test was a constitutional search incident to arrest and valid under the implied-consent statute. *See Birchfield v. North Dakota,* 579 U.S. ___, ___, ___, 136 S. Ct. 2160, 2177, 2185 (2016).[18]

Importantly, nothing in today's opinion invalidates the implied-consent laws for motorists, which have been in place in our state for over half a century. Trial judges should accept the word of the majority and Chief Justice Cady's special concurrence that today's decision is limited to drunken boaters. The door is closed to any effort to extend this decision to drunken drivers. Even so, the majority is wrong to suggest that there is a relevant constitutional distinction between the implied-consent laws for boating and for driving. If you refuse the breath test as

---

[18]We held over this appeal from last term for supplemental briefing and a second argument last September in light of *Birchfield.* Why did we delay our decision by over a year for *Birchfield* only to decline to follow its resolution of the constitutionality of warrantless breath tests?

a boater, you receive a mandatory civil penalty of $500 for your first refusal, and you are not allowed to operate a boat for a year. *See* Iowa Code § 462A.14B(2) (2013). On the other hand, if you refuse the breath test as a driver, you lose your driver's license for one year for your first refusal and pay a $200 civil penalty. *See* Iowa Code §§ 321J.9(1), .17(1). Now ask yourself, which is a more serious consequence for refusal: (1) losing your driver's license for a year and having to pay $200, or (2) being unable to operate a boat for a year and having to pay $500? I think the vast majority of Iowans—if they had to choose—would pick the boating sanction over the driving sanction. Even though a boater's refusal to take the breath test results in a larger monetary penalty, many people would gladly pay $500 and give up recreational boating in return for being able to keep their driver's licenses, especially when they take into account the impact of a driver's license suspension on what they will have to pay in the future for car insurance. If constitutionality turns on the seriousness of the sanction, then the sanction for a driver's refusal to test is more serious than the sanction for a boater's refusal to test.

The special concurrence tries to patch this hole in the majority's reasoning by asserting that the driver is only "losing the benefit of the bargain that resulted in obtaining the privilege to drive." The State granted the right to drive, and the State is taking back the right to drive because the motorist did not consent to testing. The problem with this reasoning is that it is totally circular. It assumes the validity of the "bargain," i.e., the implied-consent law for driving. One can just as well argue that the boater is losing only the benefit of his or her bargain, since the $500 penalty is part of the statutory scheme that the boater accepts when operating a boat on the state's waters.

The legislature rationally included a $500 penalty for a boater's refusal to submit to a breath test. Otherwise, drunken boaters could simply refuse the test without meaningful consequence. Loss of boating privileges alone is insufficient. Boating, unlike driving, is typically a social activity, and most could simply have a friend or family member operate the boat while they enjoy the ride.

Well-settled precedent upholds the constitutionality of implied-consent laws. *See, e.g.*, *Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2185. The reasoning of those cases applies equally to boaters. The majority misleadingly cites cases requiring warrants for invasive *blood* tests as if those courts were talking about breath tests, even as the majority ignores the nearly unanimous view of courts nationwide upholding warrantless *breath* tests under equivalent implied-consent statutes. The majority blurs the dispositive distinction between *implied-consent* statutes, lawfully enacted to promote safe driving and boating, and *actual* consent put in question by the very intoxication to be measured by the breath test.

The majority pretends the technology is already in place to quickly obtain electronic warrants from the field. It is not. In fact, internet connectivity is spotty or lacking in popular boating areas and much of rural Iowa. Iowa law has required most warrants to be presented in person to a judicial officer.[19] The majority blithely suggests the

---

[19]The majority notes telephone warrants are permitted under limited circumstances set forth in Iowa Code section 321J.10(3). In *State v. Johnson*, we noted the time-consuming complexities involved in that telephonic warrant procedure:

> Obtaining a warrant by telephone is fairly complicated; an officer cannot simply call up a magistrate and make a general request for a warrant. The officer must prepare a "duplicate" warrant and read the duplicate warrant, verbatim, to the magistrate. The magistrate then must enter, verbatim, what has been read to him on a form to be considered as the

legislature fund the technology upgrades for patrol officers statewide for the brave new world in which instant warrants can be obtained anywhere in Iowa 24/7. That world is years away.

Pettijohn did not raise the unsupported theories employed by the majority to reverse his conviction. The majority goes well beyond what Pettijohn argued in district court or on appeal and thereby blindsides the State and unfairly reverses the district court on theories never presented in that forum. We are supposed to be impartial adjudicators rather than partisan advocates. And, by concocting new theories on appeal, the majority makes new bad law without allowing the State the opportunity to develop a record affirmatively refuting the flawed factual premise underlying the majority's holding—that warrants can be obtained electronically within minutes. There is no factual support in the record for that premise.[20]

---

original warrant. Iowa Code § 321J.10(3)(*b*). The oral application must set forth facts and information tending to establish the grounds for the issuance of the warrant and describe with reasonable specificity the person or persons whose driving has been involved and from whom the specimen is to be withdrawn. *Id.* § 321J.10(3)(*c*). Gathering of this information, of course, requires considerable time. If a voice recording device is available to the magistrate, the magistrate may record the call, but otherwise "shall cause a stenographic or longhand memorandum to be made of the oral testimony of the person applying for the warrant." *Id.* § 321J.10(3)(*d*). If the magistrate is satisfied that the grounds for the issuance of the warrant have been established, the magistrate shall order the issuance of the warrant by directing the officer applying for it to sign the magistrate's name to the "duplicate" warrant. *Id.* § 321J.10(3)(*e*).

744 N.W.2d 340, 345 (Iowa 2008).

[20]The majority relies on a special concurrence in *State v. Gaskins*, which states officers have "the capability to access the court system from the computer in a police vehicle to request a search warrant based on probable cause at all times of the day and night." 866 N.W.2d 1, 17 (Iowa 2015) (Cady, C.J., concurring specially). There was no factual support for that assertion in *Gaskins*.

**I. Today's Opinion Undermines Public Safety Without Advancing Civil Liberties.**

The majority eviscerates Iowa's implied-consent regimen for boaters, but to what end? Nowhere does the majority or Pettijohn suggest a neutral magistrate would have refused to issue a warrant for his breath test on this record. How have we advanced the rights of drunken boaters, other than allowing them to avoid the legal consequences of their actions? Our courts can and do suppress test results in appropriate cases when statutory or constitutional requirements are not met. *See State v. Walker*, 804 N.W.2d 284, 296 (Iowa 2011) (suppressing breath-test results as remedy for violation of statutory requirement to permit detainee to meet alone and in private with attorney); *State v. Albrecht*, 657 N.W.2d 474, 477 (Iowa 2003) ("The remedy for not substantially complying with the implied-consent procedure is the exclusion of the test results . . . ."). This is not such a case.

**A. The Purposes of the Warrant Requirement Are Not Served by Requiring a Warrant for Breath Tests.** We have expressed a preference for warrants. *State v. Breuer*, 808 N.W.2d 195, 200 (Iowa 2012). But our rationales for that preference do not support abandoning the implied-consent law in favor of warrants for breath tests. The particularity requirement precludes general warrants and limits the scope of the search to "cabin police power" so police do not search places and things not described in the warrant. *See id.* (quoting *State v. Ochoa*, 792 N.W.2d 260, 273 (Iowa 2010)). Only a breath test is at issue here, a procedure that is "capable of revealing only one bit of information, the amount of alcohol in the subject's breath." *Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2177; *see also id.* at ___, 136 S. Ct. at 2181 (explaining

warrants would not serve the function of "delineating the scope of a search" because "[i]n every case the scope of the warrant would simply be a [blood alcohol content (BAC)] test of the arrestee").

A warrant requirement also imposes the "deliberate, impartial judgment of a judicial officer . . . between the citizen and the police." *Breuer*, 808 N.W.2d at 201 (alteration in original) (quoting *United States v. Grubbs*, 547 U.S. 90, 99, 126 S. Ct. 1494, 1501 (2006)).  Here, the district court correctly found the statutory implied-consent requirements were met and probable cause existed to search Pettijohn's breath.  Officer Wineland observed Pettijohn operating the boat, and two other officers observed Pettijohn's slurred speech, bloodshot eyes, and poor performance on field tests for sobriety.  How often does the majority imagine a magistrate will refuse a warrant for a breath test presented electronically based on the officer's stated observations of the suspect's intoxication?  *See Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2181 ("In order to persuade a magistrate that there is probable cause for a search warrant, the officer would typically recite the same facts that led the officer to find that there was probable cause for arrest . . . .").  What value are we adding by requiring a warrant?  If the requisite grounds for requesting a breath test are lacking, the test results can and should be suppressed.  Do we really need our judicial officers to review warrant applications on nights and weekends when drunk boaters are typically detained?  And, if so, would the magistrate not be better positioned to assess the grounds for the warrant if the officer appeared in person to answer questions?

**B. Today's Decision Creates Practical Problems.**  Officers will have to race the clock as blood alcohol dissipates, set aside their other duties, and obtain a search warrant for the breath test.  This may take

over an hour, during which time the officer is unavailable to patrol to detect other crimes or respond to other emergencies. In rural areas, it may be impossible to get a warrant in time. For example, in *State v. Seige*, a drunken boater fell off his speedboat while executing a turn, and his unmanned boat crashed into a sailboat, killing one of the occupants. No. CR070292771, 2009 WL 659198, at *1 (Conn. Super. Ct. Feb. 11, 2009). "After the collision, the defendant's vessel continued to run in circles at a high rate of speed posing a great danger to other vessels on the river." *Id.* As a result, his boat could not be brought under control until about forty-five minutes after the accident. *Id.* The defendant was not delivered to the dock until approximately one hour after the accident. *Id.* at *2. The dock area was crowded because "of the holiday weekend" and "onlookers brought on by the chaotic scene." *Id.* After administering rushed field sobriety tests in the dock's parking lot, the officers transported the defendant to the police station. *Id.* at *3. Officers were only able to administer the first blood alcohol test over two hours after the accident. *Id.* The defendant's BAC test results of .15 and .17 were suppressed because the tests were not administered within two hours as required by statute. *Id.* at *3, *5; *see also* Iowa Code § 462A.14A(4)(*b*) ("If the peace officer fails to offer a test within two hours after the preliminary screening test is administered or refused, or the arrest is made, whichever occurs first, a test is not required, and there shall be no suspension of motorboat or sailboat operation privileges."). Now, imagine if the officers *also* had been required to apply for, and receive, a warrant in the midst of this chaos. We can expect round after round of hearings to adjudicate exigency exceptions or issues of actual consent.

Indeed, as the Supreme Court cautioned,

> If a search warrant were required for every search incident to arrest that does not involve exigent circumstances, the courts would be swamped. And even if we arbitrarily singled out BAC tests incident to arrest for this special treatment . . . , the impact on the courts would be considerable. The number of arrests every year for driving under the influence is enormous—more than 1.1 million in 2014. Particularly in sparsely populated areas, it would be no small tasks for courts to field a large new influx of warrant applications that could come on any day of the year and at any hour. In many jurisdictions, judicial officers have the authority to issue warrants only within their own districts, and in rural areas, some districts may have only a small number of judicial officers.

*Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2180 (citations omitted). There is good reason no other court or legislature has required search warrants for breath tests. It is nonsensical.

Our legislature enacted implied-consent laws to avoid such problems. "[W]e have continuously affirmed that the primary objective of the implied consent statute is the removal of dangerous and intoxicated drivers from Iowa's roadways in order to safeguard the traveling public." *Welch v. Iowa Dep't of Transp.*, 801 N.W.2d 590, 594 (Iowa 2011); *see also State v. Wallin*, 195 N.W.2d 95, 96 (Iowa 1972) ("The [implied-consent] law was enacted to help reduce the appalling number of highway deaths resulting in part at least from intoxicated drivers."). That goal of public safety applies to motorists and boaters alike.

"Alcohol use is the leading known contributing factor in fatal boating accidents." U.S. Coast Guard, *2016 Recreational Boating Statistics* 6 (May 22, 2017), http://www.uscgboating.org/library/accident-statistics/Recreational-Boating-Statistics-2016.pdf. Susan Stocker, boating law administrator and education coordinator for the Iowa Department of Natural Resources, recently explained,

> One-third of all boating fatalities nationally involved alcohol and many of those victims were innocent bystanders . . . .
>
> The effects of alcohol can be intensified when combined with wind and wave action and an extended time spent in the sun. Operators may not think they are under the influence, but their judgment, reaction time, balance and vision indicate that they are . . . .

News Release, *Operation Dry Water Starts June 24* (June 21, 2016), http://www.iowadnr.gov/About-DNR/DNR-News-Releases/ArticleID/ 762/Operation-Dry-Water-Starts-June-24.

Implied-consent laws have withstood the test of time in Iowa for over a half century. The legislature enacted Iowa's first implied-consent law in Iowa in 1963. *Welch*, 801 N.W.2d at 594 (citing 1963 Iowa Acts, ch. 114, § 37–50 (codified at Iowa Code ch. 321B (1966))). The general assembly declared the implied-consent provisions "are necessary in order to control alcoholic beverages and aid the enforcement of laws prohibiting operation of a motor vehicle while in an intoxicated condition." 1963 Iowa Acts ch. 114, § 37.[21] And now as to drunken boaters, this court overrides that rational policy choice by our elected branches of government.

**II. Our Court, and Other State Courts, Have Repeatedly Held that Implied-Consent Laws Are Not Inherently Coercive.**

Pettijohn concedes that "implied consent schemes have, to date, passed constitutional muster as they pertain to ordinary operating while intoxicated cases involving driving of motor vehicles on public highways." Although a reader would not know this from the majority opinion, we have repeatedly rejected constitutional challenges that Iowa's implied-

---

[21]"In 1986, the implied-consent statutes from chapter 321B were combined with the criminal OWI laws." *State v. Fischer*, 785 N.W.2d 697, 700 (Iowa 2010) (citing 1986 Iowa Acts ch. 1220 (codified at Iowa Code ch. 321J (1987))).

consent laws are coercive. *State v. Bernhard*, 657 N.W.2d 469, 472 (Iowa 2003) (concluding decision to take blood test not coerced even though defendant "was motivated to agree to a blood test because of the desire not to lose his license"); *State v. Owens*, 418 N.W.2d 340, 344 (Iowa 1988) (holding no due process violation because "decision to submit to chemical testing [was] a reasonable and informed decision to cooperate with the officers' investigation rather than a decision coerced by threat"); *State v. Knous*, 313 N.W.2d 510, 512 (Iowa 1981) ("Because the State does not have to prove the accused knew of his right to refuse the test, we hold that the officers administering the test do not have a due process obligation to inform him of that right under either the Iowa or United States Constitution."); *State v. Vietor*, 261 N.W.2d 828, 830 (Iowa 1978) ("We have upheld the constitutionality of this [implied-consent] statute and have approved the admissibility of such [test] refusal[s] in criminal trials."); *State v. Johnson*, 257 Iowa 1052, 1062, 135 N.W.2d 518, 525 (1965) (rejecting constitutional challenge, stating that Iowa's implied-consent "law is almost identical to laws of a like nature upheld in other states"). The majority effects a sea change in Iowa law today without fairly confronting our precedent.

The majority also fails to acknowledge the legion of cases in other states rejecting similar constitutional challenges. *See, e.g., People v. Harris*, 170 Cal. Rptr. 3d 729, 734 (App. Dep't Super. Ct. 2014) ("[C]onsent is not invalid under the Fourth Amendment simply because it was given in advance and in exchange for a related benefit, and this is all the implied consent law accomplishes."); *Johnson v. State*, 450 N.E.2d 123, 125 (Ind. Ct. App. 1983) ("Knowledge of a possible penalty for refusal to submit to the test is not so inherently coercive as to negate [the defendant's] consent."); *State v. Brooks*, 838 N.W.2d 563, 570–72 (Minn.

2013) (rejecting claim that consent was coerced when driver was told refusal constituted criminal offense); *State v. Padley*, 849 N.W.2d 867, 876 (Wis. Ct. App. 2014) ("The fact that the driver is forced to make a difficult choice does not render the consent involuntary."); *Walters v. State ex rel. Wyo. Dep't of Transp.*, 300 P.3d 879, 883 (Wyo. 2013) ("Explaining the consequences of her choice as to whether to take the test may or may not have pressured Walters in some sense, but providing accurate information did not rise to a level of coercion which would render her consent involuntary.").

In *Padley*, cited by the majority, the Wisconsin Court of Appeals concluded that its implied-consent statute *did not* violate the Fourth Amendment or render an accused's consent coerced. 849 N.W.2d at 881, 887. The court observed the implied-consent statute "does not authorize searches, it authorizes law enforcement to require a driver to choose between giving actual consent to a blood draw, or withdrawing 'implied consent' and suffering implied-consent-law sanctions." *Id.* at 880. The *Padley* court appropriately distinguished *Missouri v. McNeely*, 569 U.S. 141, 133 S. Ct. 1552 (2013), upon which the majority relies, because it was not "a consent case." *Padley*, 849 N.W.2d at 881. The *Padley* court found that consent was voluntary, stating, "Nowhere does [defendant] develop a legal argument that the State cannot present a suspect with the hard choice of giving up a constitutional right or accepting a permissible penalty." *Id.* at 886; *see also People v. Harris*, 184 Cal. Rptr. 3d 198, 209 (Ct. App. 2015) ("[W]e conclude that free and voluntary submission to a blood test, after receiving an advisement under the implied consent law, constitutes actual consent to a blood draw under the Fourth Amendment."); *Brooks*, 838 N.W.2d at 572 (highlighting implied consent as a "legal tool" and holding consent was

not coerced merely because Minnesota attached penalties for refusal); *State v. Modlin*, 867 N.W.2d 609, 619–20 (Neb. 2015) (concluding that driver consented to the blood draw despite implied consent imposing a "difficult choice" of consent or revocation).

The reasoning of these cases applies with equal force to boating. *See, e.g., State v. Rossiter*, No. A13–2210, 2014 WL 5506964, at *3 (Minn. Ct. App. Nov. 3, 2014) (concluding that boating implied-consent advisory did not "coerce[] [boater's] consent"); *see also Commonwealth v. Thompson*, 32 N.E.3d 1273, 1277 (Mass. App. Ct. 2015) ("[A]ny person arrested for a violation of the boating OUI statute does not have a constitutional right to refuse to submit to a blood test."). The implied-consent statute "establishes the basic principle that a driver impliedly agrees to submit to a test in return for the privilege of using the public highways." *State v. Hitchens*, 294 N.W.2d 686, 687 (Iowa 1980). "If the driver withdraws that consent by refusing an appropriate request by an officer to take a test, the statute allows the state to withdraw the driver's privilege of using our public highways." *Id.* The same is true for operating a motorboat on public waterways. "In the unique context of giving consent to a search . . . in exchange for a benefit, the person cannot enjoy the benefit only then to renounce the cost, and expect to continue enjoying the benefit." *Harris*, 170 Cal. Rptr. 3d at 735; *see also State v. Holt*, 261 Iowa 1089, 1094, 156 N.W.2d 884, 887 (1968) ("We know of no reason why a person in order to enjoy the privilege so granted may not waive such 'rights' as he might otherwise have.").

**III. *Gaskins* Is Not on Point; This Is a Search of the Person, Not the Vehicle, Incident to Arrest.**

The majority relies heavily on *State v. Gaskins*, 866 N.W.2d 1 (Iowa 2015), but misapplies it. In *Gaskins*, our court diverged from settled

Federal Fourth Amendment precedent to limit warrantless searches incident to arrest (SITA) to those necessary for officer safety or "justified by the State's interest in preserving evidence from destruction, not merely collecting it expediently." *Id.* at 14. *Gaskins* does not support the majority's decision for four reasons. First, *Gaskins* was wrongly decided. *See id.* at 38 (Waterman, J., dissenting); *id.* at 56 (Zager, J., dissenting). Second, *Gaskins* is inapposite because neither actual consent nor implied consent was at issue. Third, under *Gaskins*, a breath test constitutes a permissible warrantless SITA to preserve evidence given the rapidly dissipating blood alcohol. *See id.* at 14 (majority opinion) ("We conclude the SITA exception to the warrant requirement under article I, section 8 of the Iowa Constitution is justified by the State's interest in preserving evidence from destruction . . . ."); *see also Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2182 (equating "preventing the loss of blood alcohol evidence as the result of the body's metabolism of alcohol" with "[s]topping an arrestee from destroying evidence" because "[i]n both situations the State is justifiably concerned that evidence may be lost").

Fourth, and most importantly, *Gaskins* is inapposite because it merely limited the search of a *vehicle*, not a person. It is important to get to the core concept of the search incident to arrest. *See Gaskins*, 866 N.W.2d at 13 (majority opinion) (declining to adopt the federal "evidence-gathering purpose as a rationale for *warrantless searches of automobiles and their contents incident to arrest* under article I, section 8 of the Iowa Constitution" (emphasis added)). When a criminal suspect is arrested, law enforcement is allowed to search the suspect's *body*—to empty the person's pockets, go through the person's clothing, and even require the person to remove clothing for search purposes. Even my colleagues do not believe such searches are unconstitutional.

A person's breath is a part of the body; it is not like a vehicle. *Cf. Gaskins*, 866 N.W.2d at 16 (holding warrant required to search locked safe in vehicle after arrest of driver). And most people would regard a breath test that takes a few seconds as less invasive of their privacy than having to remove their clothes. So *Gaskins* is not the correct analogy at all.

As the United States Supreme Court pointed out in *Birchfield*, the basis for requiring a warrant before a breath test is administered to an arrestee would also require a warrant before "searching through objects found on the arrestee's possession." 579 U.S. at ___, 136 S. Ct. at 2180. Likewise, if a rape victim reported to the police that she had scratched her male assailant's chest while resisting, the majority's reasoning today would require a warrant before police could ask the arrested assailant to remove his shirt. "If a search warrant were required for every search incident to arrest that does not involve exigent circumstances, the courts would be swamped." *Id.* I dissented in *Gaskins*, but there is no need to extend our Iowa search and seizure law relating to automobiles to searches *of the person* incident to arrest.

### IV. The Majority Departs from *Birchfield*.

*Birchfield*, as the majority concedes, makes clear that warrantless breath tests satisfy the Fourth Amendment. *Id.* at ___, 136 S. Ct. at 2185 ("Because breath tests are significantly less intrusive than blood tests . . . , we conclude that a breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving. As in all cases involving reasonable searches incident to arrest, a warrant is not needed in this situation."). I would reach the same conclusion under article I, section 8 of the Iowa Constitution.

The Supreme Court has drawn a clear distinction between breath tests and coerced blood draws. *See id.* at ___, 136 S. Ct. at 2165 ("The impact of breath tests on privacy is slight . . . . Blood tests, however, are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test."); *McNeely*, 567 U.S. at ___, 133 S. Ct. at 1568 ("[A] compelled physical intrusion beneath McNeely's skin and into his veins to obtain a sample of his blood for use as evidence in a criminal investigation . . . implicate[d] an individual's 'most personal and deep-rooted expectations of privacy.' " (quoting *Winston v. Lee*, 470 U.S. 753, 760, 105 S. Ct. 1611, 1616 (1985))). Pettijohn was offered and consented to take the breath test—he simply had to exhale into a tube. Any infringement upon Pettijohn's privacy was *de minimis* at best: "Humans have never been known to assert a possessory interest in or any emotional attachment to *any* of the air in their lungs." *Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2177.

The majority misleadingly asserts that "a number of state courts concluded the mere existence of statutorily implied consent does not permit the administration of a warrantless test of an individual's blood, breath, or urine consistent with the Fourth Amendment." The majority supports that assertion by citing thirteen cases, without disclosing that twelve of the thirteen involved warrantless *blood* tests, not the breath test at issue here. *See State v. Butler*, 302 P.3d 609, 613 (Ariz. 2013) (en banc); *Harris*, 184 Cal. Rptr. 3d at 213; *Williams v. State*, 771 S.E.2d 373, 377 (Ga. 2015); *State v. Halseth*, 339 P.3d 368, 371 (Idaho 2014); *State v. Declerck*, 317 P.3d 794, 799 (Kan. Ct. App. 2014); *Brooks*, 838 N.W.2d at 568; *Modlin*, 867 N.W.2d at 619; *Byars v. State*, 336 P.3d 939, 945–46 (Nev. 2014); *State v. Fierro*, 853 N.W.2d 235, 242–43 (S.D. 2014); *State v. Wells*, No. M2013–01145–CCA–R9CD, 2014 WL 4977356, at *13

(Tenn. Crim. App. 2014); *Weems v. State*, 434 S.W.3d 655, 665 (Tex. Ct. App. 2014); *Padley*, 849 N.W.2d at 887. Even worse, the majority fails to note that in three of its cited cases, the defendant withdrew his consent, and a warrantless forcible blood draw was administered over his objection. *Halseth*, 339 P.3d at 369; *Fierro*, 853 N.W.2d at 237; *Weems*, 434 S.W.3d at 658; *see also Byars*, 336 P.3d at 945–46 ("The State's argument that consent is valid . . . is problematic because the statute makes the implied consent irrevocable.").

The Iowa statute gives the driver a choice to consent or refuse the breath test. *See Welch*, 801 N.W.2d at 595 ("Thus, from a practical standpoint, and subject to certain exceptions, the driver must actually consent to the chemical testing."[22] (Footnote omitted.)). Pettijohn chose to take the breath test after being read the advisory that tracked the language of the statute. He, like any other Iowan, could have conferred with his own attorney for advice whether to consent to the test. *Walker*, 804 N.W.2d at 290 (citing Iowa Code § 804.20). We have never held the implied-consent advisory must inform the defendant of his *constitutional* right to refuse consent. *See Knous*, 313 N.W.2d at 511 ("Thus the right to refuse the test is a statutory right to withdraw consent which is deemed to exist by statutory implication."); *see also South Dakota v. Neville*, 459 U.S. 553, 560 n.10, 103 S. Ct. 916, 921 n.10 (1983) ("[A] person suspected of drunk driving has no constitutional right to refuse to take a blood-alcohol test.").

---

[22]"Iowa Code section 321J.7 provides that '[a] person who is dead, unconscious, or otherwise in a condition rendering the person incapable of consent or refusal is deemed not to have withdrawn the consent provided by section 321J.6.'" *See also Welch*, 801 N.W.2d at 595 n.4 (quoting Iowa Code § 321J.7). Pettijohn was not in such a condition and freely consented to the breath test.

The Supreme Court has also distinguished between implied-consent statutes that impose *criminal* sanctions and those that only impose civil penalties. In *Birchfield*, the Court held that a motorist could not be deemed to have consented to a blood draw when the implied-consent threatened a criminal penalty for refusal. 579 U.S. at ___, 136 S. Ct. at 2185. However, the Court distinguished implied-consent statutes imposing civil penalties, noting,

> Our prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply. Petitioners do not question the constitutionality of those laws, *and nothing we say here should be read to cast doubt on them.*

*Id.* (emphasis added) (citations omitted). In *State v. Yong Shik Won*, cited by the majority, the Hawaii Supreme Court held its implied-consent statute unconstitutional when the defendant was informed that if he refused to submit to a test, he could be convicted of a crime for that test refusal and subject to thirty days' imprisonment and a fine of $1000. 372 P.3d 1065, 1069, 1081 (Haw. 2015). By contrast, Iowa's implied-consent statutes impose no jail sentence or other *criminal* penalty for refusing a breath test. *See* Iowa Code § 462A.14B(2) (imposing civil monetary penalty and license revocation for one year). There is a stark difference between the thirty days in jail threatened in *Yong Shik Won* and the assessment of a monetary civil penalty. *Cf. State v. Richardson*, 890 N.W.2d 609, 622–23 (Iowa 2017) ("Thus, being incarcerated and owing a restitution debt are simply not comparable. One is a matter of liberty, the other a financial obligation.").

Not surprisingly, after *Birchfield*, state courts have continued to reject constitutional challenges to implied-consent laws imposing civil penalties for refusing breath tests. *See Espinoza v. Shiomoto*, 215

Cal. Rptr. 3d 807, 831 (Ct. App. 2017) ("[W]e conclude refusal to submit to a breath test incident to arrest may also be the basis of imposing civil penalties under the implied consent law, including suspension or revocation of the motorist's driver's license."); *People v. Simpson*, 392 P.3d 1207, 1213 (Colo. 2017) ("Colorado's Expressed Consent Statute imposes only civil, and not criminal, penalties for refusal.  Therefore, . . . *Birchfield* sanctions rather than forbids justifying a warrantless blood draw on the basis of statutory consent."); *Lepre v. Commonwealth*, ___ A.3d ___, ___, 2017 WL 1337550, at *4 (Pa. Commw. Ct. Apr. 12, 2017) (upholding civil penalty of license revocation for refusal to submit to breath test); *Wolfe v. Commonwealth*, 793 S.E.2d 811, 815 (Va. Ct. App. 2016) ("Significantly, appellant was not exposed to a criminal penalty if he refused the breath or blood test.").  Iowa's civil penalty for a test refusal likewise is constitutional.

None of the cases cited by the majority have held that an implied-consent procedure offering defendant a choice is invalid as to warrantless breath tests.  Our court is the first and only court to reach that conclusion.  After *Birchfield*, courts have upheld implied consent under both the Federal and State Constitutions.  *See State v. Navarro*, 382 P.3d 1234, 1236 (Ariz. Ct. App. 2016) (holding under art. II, § 8 of Arizona Constitution "non-invasive breath tests for DUI arrestees" were a "slight inconvenience" and did not require a warrant (quoting *State v. Berg*, 259 P.2d 261, 266 (1953), *overruled on other grounds by State v. Pina*, 383 P.2d 167, 168 (1963))); *Williams v. State*, 210 So. 3d 774, 776 (Fla. Dist. Ct. App. 2017) ("[W]e adopt the holding in *Birchfield* that breath-alcohol tests are permissible . . . ."); *State v. Cornwell*, 884 N.W.2d 722, 726–27 (Neb. 2016) ("[P]ost-*Birchfield*, a warrantless breath test is reasonable and does not run afoul of the Fourth Amendment.  Nor do we find that it

runs counter to Neb. Const. art. I, § 7 . . . ."); *Commonwealth v. Boone*, No. 3492 EDA 2015, 2017 WL 781664, at *2 n.4 (Pa. Super. Ct. Feb. 28, 2017) (noting that even if issue of warrantless breath test had been preserved, "it would not warrant relief"); *State v. Baird*, 386 P.3d 239, 245, 247 (Wash. 2016) (en banc) (concluding there was "no constitutional right to refuse the breath test" although implied-consent statute granted right to refuse as aspect of "legislative grace"); *State v. Lemberger*, 893 N.W.2d 232, 242 n.13 (Wis. 2017) ("[S]uffice it to say that Lemberger does not adequately establish that Article I, section 11 possesses a different meaning than the Fourth Amendment to the United States Constitution in this context."). I would follow the legion of cases that uphold implied-consent statutes for breath tests.

The *Birchfield* Court held "the Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving." 579 U.S. at ___, 136 S. Ct. at 2184. I reach the same conclusion under our state constitution for boaters and motorists alike and would affirm the district court.

**V. Given the Predictable Legislative Response, the Court's Decision Will Lead Us Away from Individualized Justice and Toward Assembly-Line Justice.**

Finally, I predict that this decision will actually disserve the very people it is intended to benefit—suspected intoxicated boaters. Iowa does not stand still for our court. In all likelihood, there will be a legislative response. This session the legislature authorized electronic warrants for the first time. S.F. 358, 87th G.A., 1st Sess. § 4 (Iowa 2017). Among other steps the general assembly may consider are (1) making preliminary breath test results admissible, and (2) narrowing

Iowa Code section 804.20 to exclude those detained for suspicion of drunken boating. Let us review them.

**A. Preliminary Breath Test Results Admissible.** Typically, a preliminary breath test (PBT) is administered at the scene of the stop when the officer has reasonable grounds to believe the boat operator is intoxicated. Under existing law, the results are not admissible, but a refusal to take the test is. Iowa Code § 321J.5(2). Yet as testing technology has advanced and these tests have become more reliable, why not just legislate that the PBT results are admissible?

**B. Revision of Iowa Code Section 804.20.** Additionally, once the implied-consent process is eliminated for boaters, it becomes more difficult to see the underlying purpose served by Iowa Code section 804.20. This statute allows someone who has been arrested to promptly call, consult with, and see an attorney or family member. Although it applies in other contexts, the statute has traditionally been tied to the implied-consent process. *See Walker*, 804 N.W.2d at 290 ("Most of our cases, however, have involved the statutory right to place a telephone call to an attorney or family member when pulled over for drunk driving."); *State v. Tubbs*, 690 N.W.2d 911, 914 (Iowa 2005) ("One purpose of section 804.20, of course, is to allow an arrestee to call an attorney before deciding whether to submit to a chemical test."). Under Iowa Code section 804.20, the person arrested for drunken boating is given an opportunity to consult with an attorney before deciding whether to take the chemical test.

But if law enforcement is going to have to get a warrant anyway so the attorney consultation fills no immediate need, why bother? Time is passing while the parties wait for the attorney to answer the phone or

come to the station house. It would not surprise me to see the legislature amend section 804.20 to exclude boaters.

**C. Electronic Warrants.** We can also expect to see electronic warrants pursuant to the new legislation. That is, law enforcement will submit a sworn warrant application via the court's electronic data management system (EDMS) to a judicial officer with a note to call "if there are questions," the magistrate will call and recite the oath, and the approved warrant will then be transmitted electronically back to law enforcement. If our court upholds this procedure under article I, section 8—and we would be hard-pressed to *disapprove* it since the majority mentions EDMS warrants as one justification for its current ruling—we will then have assembly-line warrants for breath testing.

So this is our future: in-the-field PBTs may be admissible, no call or consultation with an attorney will be allowed before chemical breath tests take place at the station, and warrants will be routinely sought and issued based on electronic applications without face-to-face contact between the judicial officer and law enforcement. Taking things further, a rotation could be devised in which one judicial officer per judicial district would be assigned one "night shift" per month. That officer would sit at her or his computer through the night and handle all of that district's electronic warrant requests. This would meet the legal requirements of today's decision, but it would not advance our criminal justice system.

For these reasons, I respectfully dissent.

Mansfield and Zager, JJ., join this dissent.